[L. A. No. 21660. In Bank. Mar. 10, 1953.]

VIRGIL V. VOELTZ, Respondent, v. BAKERY AND CON-
FECTIONERY WORKERS INTERNATIONAL
UNION OF AMERICA, LOCAL UNION NUMBER 37
et al., Appellants.

Gilbert, Nissen & Irvin, Robert W. Gilbert and Clarence E. Todd for Appellants.

Charles P. Scully and Tobriner & Lazarus as Amici Curiae on behalf of Appellants.

Hyman Smith and Howard R. Harris for Respondent.

Roth & Bahrs as Amici Curiae on behalf of Respondent.

SHENK, J.—This is an appeal from an order granting a preliminary injunction and an order denying a motion to vacate that order.

According to the complaint and affidavits viewed most favorably to plaintiff, it appears that plaintiff is engaged in the business of making and distributing bakery products to the wholesale trade, under the name Golden Krust Bakery. Defendants are labor unions and members thereof, the main ones being Bakery and Confectionery Workers' International Union of America, Local Union No. 37 and Bakery Drivers Local Union No. 276. In 1948, plaintiff employed 49 persons, consisting of 45 production workers, two truck drivers and two miscellaneous. Plaintiff sells his products to independent "route dealers" who in turn sell to consumers, and to retail dealers in bakery products, delivery to the latter being made by plaintiff's trucks and the product being picked up by the former at plaintiff's place of business. In the latter part of 1948, defendants' Locals 37 and 276, commenced a campaign to organize plaintiff's employees and to induce them to join their unions and demanded that plaintiff sign a contract with them making them exclusive bargaining agents for his employees. Plaintiff refused, because a "substantial number" of his employees advised him that they would refuse to join the unions, and if he signed such a contract, they would quit. In August, 1948, it was claimed that plaintiff discharged one of his employees because of union membership and the unions filed charges with the National Labor Relations Board that such act was an unfair labor practice. Later in November, 1948, the employee was reinstated under a settlement in that proceeding and plaintiff was required to post notices that he would discontinue such practice. Defendants assert that the employee was again discharged. In September, 1948, Local 37 filed a petition with the National Labor Relations Board for certification as collective bargain-

ing representative for plaintiff's employees. The board held a hearing and dismissed the petition on November 23, 1948.

On December 7, 1948, the unions representing 10 of plaintiff's employees threatened to and did place pickets around plaintiff's plant, and continued to picket said plant until January 19, 1950, when this action was commenced; said unions also called a strike of plaintiff's employees to which 10 responded and ceased work for a week. The unions advised plaintiff on occasions between December, 1948, and November, 1949, that unless he signed contracts with them they would destroy his business, although they knew plaintiff's employees were against it. The unions placed plaintiff on the "blacklist" as unfair to organized labor. The pickets carried signs stating that plaintiff was unfair to organized labor. Some of the pickets followed the independent route dealers to their customers and displayed their signs. The unions contacted plaintiff's retail customers and threatened to picket them unless they ceased to buy plaintiff's products; some of plaintiff's customers were picketed by defendants. As a result of defendant unions' activities, plaintiff's customers refused to buy from him, to the grave injury of plaintiff's business.

On November 19, 1949, all but two of plaintiff's then 39 employees (the others later consented) met and formed a labor organization, called Golden Krust Independent Employees Association, to represent them. It is not controlled or dominated by plaintiff. On November 21, 1949, the association petitioned the National Labor Relations Board for certification as exclusive bargaining agent. It was certified as a labor organization but the petition to be exclusive bargainer was dismissed on the ground that interstate commerce was not affected. Discussions were had between the association and the unions in the latter part of December, 1949, and January, 1950, the former requesting the latter to cease their concerted activities. On December 10, 1949, the association requested of the unions that a secret ballot election be held among plaintiff's employees to determine the bargaining representative. This request was denied. The association informed plaintiff that if he signed a contract with the unions it would call a strike.

The trial court, in the preliminary injunction, enjoined defendants from picketing plaintiff's plant, representing that his employees are unorganized, and his products are made by unorganized labor.

There is no indication that the dispute affected interstate commerce, hence the Labor Management Relations Act of

1947 (29 U.S.C.A. § 141 et seq.) is not involved. Defendants belatedly make the contention that the National Labor Relations Board said in one of its orders of dismissal above referred to that it did not agree with plaintiff that he was not engaged in interstate commerce, but it does not appear that such order was called to the attention of the trial court either before its order for the preliminary injunction or on the motion to vacate it. There is no allegation in the complaint or statement in any affidavit or defendants' answer that plaintiff is engaged in interstate commerce. The validity of the Jurisdictional Strike Law of California (Lab. Code, § 1115 et seq.) is questioned, but that point was settled in *Seven Up Bottling Co.* v. *Grocery Drivers Union, ante,* p. 368 [254 P.2d 544].

Plaintiff rests his support for the injunction and the court granted it on the basis of the Jurisdictional Strike Law. The main contention of defendants, aside from the claimed invalidity of the Jurisdictional Strike Law, is that there was no violation of that law, because their picketing and concerted activity did not arise out of a dispute between two labor organizations, they and the association, because the dispute between them and plaintiff had been in existence some 11 months before the association was organized. Involved herein is the interpretation and application of sections 1117 and 1118 of the Labor Code, reading: "As used herein, 'labor organization' means any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, which labor organization is not found to be financed in whole or in part, interfered with, dominated or controlled by the employer." (§ 1117.) "As used in this chapter, 'jurisdictional strike' means a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer." (§ 1118.)

It should first be observed that the defendants speak of the association as a "company" union, suggesting that as such it is excluded from consideration under the Jurisdictional Strike Law. But it is only a company union "financed in whole or in part, interfered with, dominated or controlled by the employer" that is excluded. (Lab. Code, §§ 1117, 1118, *supra*.) While the evidence is conflicting, plaintiff's verified complaint and affidavits offered by him show the association not to be such an organization. Defendants claim that the one who organized the association was the brother of one of plaintiff's foremen, that some of plaintiff's supervisory employees attended a meeting of the association, and that such organizations must be carefully scrutinized, citing *McKay* v. *Retail Auto Salesmen's Local Union*, 16 Cal.2d 311 [106 P.2d 373]. Nevertheless, the court granted the injunction, thereby impliedly finding that the association was not company dominated, and stated in its memorandum opinion: "As to defendant's second contention, it cannot be said, *at this stage of the proceedings*, that the employee organization is not a bona fide union and that it is not free from company domination and control. It appears from the affidavits that the idea of an employee union has been discussed between at least some of the employees as early as April of last year, and that in November a person who was experienced in labor organization problems and who was in no way connected with plaintiff was consulted by the employees and invited to meet with them. Such a meeting was held on November 19th and the union of non-supervisory employees was formed and officers elected."

The trial court was the judge of the credibility of the affidavits and it was its province to resolve all conflicts. (*Northwestern Pac. R. Co.* v. *Lumber & S.W. Union*, 31 Cal. 2d 441, 443 [189 P.2d 277].) The complaint alleged that there was no domination or control by plaintiff over the association and the affidavits submitted by him are to the same effect.

In their argument that their concerted interference did not arise out of a controversy between them and another labor organization (Lab. Code, § 1118, *supra*) because the controversy existed prior to the formation of the association, they stress the assertion that the latter was an excluded company union. It was not, however, so far as the preliminary injunction is concerned, and hence the case must be treated as if there are two wholly independent labor organizations.

We do not believe that the fact that a dispute existed between defendants and plaintiff before the association was

formed and came into the picture, takes the case out of the act requiring that the interference with the employer's business arise out of a controversy between unions, for after the association was formed and plaintiff's employees became members thereof, it endeavored to have defendants withdraw from the arena and to induce plaintiff to bargain with it exclusively, yet defendants continued their activities, interfering with plaintiff's business. It may be inferred that what began as a dispute between employer and the union became a dispute between unions as to which should .be exclusive bargaining agent. To place defendants' construction on the act would make it practically never applicable, for the unions would have to act simultaneously in their demands or disputes with the employer before there would be an interference with the employer's business arising out of a controversy between the unions as to which should be exclusive bargaining agent. If one of them made the demand any time before the other, then the interference would arise out of a dispute between the employer and that union rather than between the unions. It would rest wholly within the power of the unions to arrange the chronology of their demands, and escape the force of the act. We do not believe such an interpretation of the act is reasonable.

The orders are affirmed.

Gibson, C. J., Edmonds, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The construction placed by the majority on the Jurisdictional Strike Act will prevent a union from continuing to press its dispute with the employer over wages or working conditions whenever the employer calls in another union and makes the dispute jurisdictional. In my opinion it was not the intention of the Legislature that the act be so construed.

The majority holds that the demand for recognition by the association, which was not even in existence until 11 months after the strike began, converted the previously lawful picketing within the prohibitions of the Jurisdictional Strike Act. The employer is allowed by the majority holding to enjoin the picketing by the union that instituted the strike, and to negotiate solely with the second union that subsequently appeared on the scene and created the interunion conflict. The act cannot reasonably be interpreted to allow an injunction in this situation.

The Jurisdictional Strike Act is designed to protect employers caught between conflicting union demands. It applies when the dispute is not one over traditional and lawful union demands, such as wages and hours, but instead is over overlapping claims by rival unions to job opportunities. In the latter situation the employer is placed in a position where he will be subjected to picketing and economic coercion, no matter how willing he may be to bargain in good faith with either union. By outlawing aggressive union action in connection with controversies between several unions over the exclusive right to perform work, California has followed a general trend in state and national legislation.

California did not, however, go farther and give the employers more protection than the necessities of the problem demanded. By the phrase ''arising out of a controversy between two or more labor organizations,'' the application of the act is limited to cases where the forbidden concerted activity results from interunion disputes. It does not apply if the dispute is simply between an employer and a union.

In the present case, the picketing by the Bakery Workers was peaceful and for a lawful purpose when it commenced on December 7, 1948. At that time there was no basis for injunctive relief. Nearly a year later, the association appeared on the scene and informed the employer that if he signed a contract with the Bakery Workers, the association would commence picketing. The majority opinion states that thereafter the picketing by the Bakery Workers came within the act. But can it be seriously contended that a continuous course of picketing in support of a strike, existing for many months before the appearance of the second union, arose out of, resulted from, or was proximately caused by a controversy between the two unions? The employer concedes that the picketing was lawful in its inception, but argues that he ''obtained a remedy'' when the second labor organization presented a demand for recognition. The majority accepts this argument and gives the employer injunctive relief, not against the second union that interfered and subjected the employer to the conflicting demands, but against the first union, that had been picketing in support of a hitherto lawful strike for the purposes of gaining recognition and reinstatement of a discharged union member. I have difficulty following the reasoning that the lawful acts of the Bakery Workers were transformed into unlawful acts by the conduct of a

hostile labor organization, with which it has no affiliation or connection.

Other provisions of the Jurisdictional Strike Act and the Labor Code would seem to reinforce the conclusion that the words "arising out of a controversy between two or more labor organizations" made the act inapplicable at the time the injunction issued. Section 1119 provides that nothing in the act "shall be construed to interfere with collective bargaining subject to the prohibitions herein set forth." This provision is meaningless, if picketing may be prohibited whenever a second union makes a demand upon the employer during the existence of a bona fide dispute between the employer and the union engaged in the picketing. Absent more specific provisions in the act, this section prevents the act from being interpreted to ban concerted union action in ordinary strikes. (See *International Labor Board* v. *Rice Milling Co.*, 341 U.S. 665, 673 [71 S.Ct. 961, 95 L.Ed. 1277].) Moreover, the public policy of this state, as expressed in section 923 of the Labor Code, is that individual workers shall be free to negotiate the terms of their employment, and to be free from the interference of their employers in concerted activities for the purpose of collective bargaining. The decisions of this court make it clear that a union may use concerted action to gain objectives reasonably related to legitimate interests of organized labor. (*McKay* v. *Retail Auto. S.L. Union*, 16 Cal.2d 311 [106 P.2d 373], and companion cases.)

The majority supports its construction of the act on the ground that otherwise it would be "practically never applicable, for the unions would have to act simultaneously in their demands or disputes with the employer before there would be an interference with the employer's business arising out of a controversy between the unions as to which should be exclusive bargaining agent."

This objection would be obviated if the act applies to the union that intervened in the pre-existing dispute between the first union and the employer. The California statute is significantly different from the Taft-Hartley Act, which provides that when one union gains certification as the union which the employees wish to represent them, other unions cannot thereafter intervene and subject the employer to conflicting demands for work assignments. (Section 8 (b) (4) (D); see *International Longshoremen's & W. Union* v. *Juneau Spruce Corp.*, 342 U.S. 237 [72 S.Ct. 235, 96 L.Ed 275]; Petro, *Union Job-Seeking Aggression,* 50 Mich.L.Rev., 497,

510-520.) The California statute does not contain certification procedure, and there thus is presented a serious problem in determining in disputes between an employer and more than one union which union is entitled to carry out concerted activities so that employees may achieve the legitimate objectives of organized labor, and which unions are prevented from entering the picture and exposing an innocent employer to mutually exclusive demands by rival unions. The majority resolves this difficulty by applying the statute to *all* unions making claims for the right to represent the employees, regardless of the prior history of disputes and contracts between the employer and the union first representing, or claiming to represent, the employees. Further, as I read the majority opinion, there is no requirement that the unions in fact represent any of the employees: all that is required is that more than one union *claim* the right to represent them. The majority would thus allow the employer either to contract with the union that offers the best terms and obtain injunctive relief against other unions making more unpalatable requests, or, so long as two rival unions are present, to enjoin picketing by both unions and gain perpetual freedom from concerted labor action. To protect employers from demands by more than one union, the majority gives the right to ban picketing by all unions, even though one union may have represented the employees for many years.

The express language of the act does not support the foregoing construction. As we have already seen, the words "arising out of a controversy between two or more labor organizations" prevent the statute from being applied to the union that originally began picketing for a lawful purpose. Concededly, however, unless the statute is meaningless, the employer must be entitled to some type of injunctive relief in order to eliminate jurisdictional demands from the picketing and confine the dispute to one over traditional lawful union objectives. The employer will be fully protected and the purposes of the act carried out by giving him relief against the demand by the *second* union. An ordinary strike between a single union and an employer does not "arise out" of a dispute between two unions, and the act thus does not apply to picketing arising out of renewal of a collective bargaining agreement or out of an organizational strike when no other union is simultaneously making a claim that it should represent the employees. On the other hand, when an employer either has a contract with one union, or is engaged in a strike with

a union, and a second union intervenes and makes demands for job rights that conflict with the demands of the first union, the controversy between the second union and the employer would appear to be one "arising out of" a jurisdictional conflict between the two unions. The action of the second union puts the employer in a position where he would face economic pressure whether he acceded to the demands of the first union, or rejected them and accepted those of the second union. The first union, however, did nothing different from what it had been doing before the second union appeared and, as to the first union, the picketing would, therefore, still "arise out of" the original dispute with the employer. Since the only reason there is any conflict between two unions over job rights is the interference of the second union, it would seem to follow that the employer is entitled to prevent the second union from concerted interference with his business, but that the first union is not within the prohibitions of the act.

The act as a whole is aimed at preventing a union from interfering with another union which has a dispute with the employer—to prevent the latter union from creating a situation where the employer is faced with demands from both unions for exclusive representation rights. It is, therefore, the latter union which should be enjoined from its activities because it is in the wrong. This is recognized by the act when it provides that "any person" injured or threatened with injury by a violation of the act may obtain injunctive relief. (Lab. Code, § 1116.) "Person" includes a labor organization. (*Ibid.*, § 1117.) Thus the union engaged in a dispute with the employer should be entitled to have the interfering union restrained from concerted activity on the ground that such activity merely creates an illusory jurisdictional strike where none exists.

The orders should be reversed.

Traynor, J., concurred.

Appellants' petition for a rehearing was denied April 2, 1953. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.