[Crim. Nos. 5264, 5265. In Bank. Mar. 10, 1953.]

In re JOHN P. KELLEHER et al., on Habeas Corpus.

Delany, Werchick, Fishgold & Minudri, J. Paul Madsen, Lee Pressman, Robert E. Burns, Crimmins, Kent, Draper & Bradley for Petitioners.

McCutchen, Thomas, Matthew, Griffiths & Greene and Morris M. Doyle for Respondents.

SHENK, J.—These are habeas corpus proceedings in which petitioners seek release from custody resulting from their arrest for picketing in violation of a temporary restraining order issued by the superior court in an action pending therein entitled *Isthmian Steamship Co. et al.* v. *National Marine Engineers Beneficial Assn. et al.*

The restraining order was issued on the basis of the verified complaint of plaintiffs in the action, and we turn, therefore, to it to ascertain the facts. Plaintiff, Isthmian Steamship Company, is a corporation engaged in the business of operating steamships as a common carrier of interstate and foreign commerce and a part of that business is conducted in California. Plaintiff, Seaboard Stevedoring Corporation, is a corporation engaged in loading and unloading steamships, known as stevedoring, and has a contract with Isthmian to load and unload its vessels in this state. Defendants are a labor union operating as an unincorporated association known as National Marine Engineers Beneficial Association, referred to herein as M.E.B.A., Marine Engineers Beneficial Association No. 97, called Local 97, which is a labor organization operating as a corporation and affiliated with, and a local unit of, M.E.B.A. and also affiliated with the Congress of Industrial Organizations, known as C.I.O., and the officers and members of those organizations. The Brotherhood of Marine Engineers, referred to as B.M.E., is an unincorporated labor organization or union affiliated with the American Federation of Labor. None of the unions are financed or controlled by plaintiffs. The members of the M.E.B.A. and B.M.E. are marine engineers whose work is later described herein.

Isthmian in its business employs licensed marine engineers who are officers in charge of engineroom departments on its steamships and as such "have authority, in the interest of Isthmian, effectively to recommend the transfer, suspension, promotion, discharge, assignment, reward and discipline of other employees, to wit, unlicensed engineroom personnel. Such engineers also have authority responsibly to direct unlicensed engineroom personnel and do so direct such personnel in the ordinary performance of their duties. The exercise by the said engineers of the authority referred to in the next two preceding sentences is not of a merely routine or clerical nature, but requires the use of independent judgment."

Prior to July 15, 1951, Isthmian had a collective bargaining agreement with M.E.B.A. which by its terms expired on that day. Prior to March, 1950, the B.M.E. commenced soliciting plaintiffs' marine engineer employees for membership in it. In March and April of that year Isthmian conducted a vote among its engineers to ascertain whether they desired M.E.B.A. or B.M.E. to represent them as collective bargaining representative, which resulted in a victory for M.E.B.A. Nevertheless, B.M.E. continued to solicit for members among Isthmian's engineers, and on May 14, 1951, advised Isthmian that it had a majority, but Isthmian continued to recognize and deal with M.E.B.A. under the bargaining contract with it. About two months before the expiration of that contract M.E.B.A. demanded provisions for a hiring hall and closed shop in a new contract. Isthmian refused, and on July 16, 1951, M.E.B.A. called a strike of the former's engineers, and commenced picketing its vessels. By letter, on August 2, 1951, B.M.E. renewed its demand to represent Isthmian's engineers, and on August 15th, the latter requested proof of its right to representation, whereupon B.M.E. exhibited pledge cards signed by 128 of Isthmian's 204 engineers and accordingly B.M.E. and Isthmian entered into a collective bargaining contract which did not contain closed shop or hiring hall clauses. M.E.B.A. was advised of that contract but continued to picket and demanded that it be recognized as exclusive bargaining agent. The B.M.E. have also picketed vessels whose owners recognize M.E.B.A. It is alleged that the picketing of Isthmian by M.E.B.A. "arises out of a controversy between the M.E.B.A. and the B.M.E. as to which of them has or should have the exclusive right to bargain with Isthmian,

as an employer, on behalf of licensed marine engineers, as employees of Isthmian.''

As a result of the picketing, longshoremen employed by plaintiff Seaboard Stevedoring Corporation, have refused to cross the picket lines and Isthmian has been unable to load or unload its vessels to the injury of its business.

The temporary restraining order issued on August 29, 1951, enjoined defendants from picketing for the purpose of inducing Isthmian to recognize them as the exclusive bargaining agent for its engineers in violation of its agreement with B.M.E. pending a hearing of an order to show cause why a preliminary injunction should not issue. Petitioners, in violation of the order, were picketing on August 30th and were arrested for violating the statute which provides that: ''Every person guilty of any contempt of court, of either of the following kinds, is guilty of a misdemeanor: . . . 4. Willful disobedience of any process or order lawfully issued by any court.'' (Pen. Code, § 166[4].)

On the assumption that the restraining order was based on the Jurisdictional Strike Law (Lab. Code, §§ 1115-1120), petitioners assert that that law is unconstitutional and that it does not apply to the facts in the instant case.

As pointed out in *Seven Up Bottling Co.* v. *Grocery Drivers Union, ante,* p. 368 [254 P.2d. 544], the Jurisdictional Strike Law defines a labor organization (Lab. Code, § 1117), declares a jurisdictional strike as therein defined to be unlawful and against public policy (*Id.* § 1115), and gives a person injured by its violation the right to injunctive relief (*Id.,* § 1116). A jurisdictional strike is defined as ''a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer.'' (*Id.,* § 1118.) We held that that law did not violate the free speech, press and assembly guaranties of the Constitution in the Seven Up case. Petitioners assert, however, that the picketing here involved did not arise out of a dispute between two unions as required by section 1118, because the dispute between Isthmian and M.E.B.A. which resulted in the strike and picketing on

July 16, 1951, and thereafter, all existed prior to the entry of B.M.E. on the scene; that the dispute at that time was solely between Isthmian and M.E.B.A. over the terms of a collective bargaining agreement, as the election in April, 1950, among Isthmian's engineers had resulted in victory for M.E.B.A. and B.M.E. was therefore out of the picture.

We cannot agree. As seen, it is alleged in the complaint that after the election and collective bargaining agreement with M.E.B.A., B.M.E. continued to solicit Isthmian's employees for members, and in May, 1951, told Isthmian it had a majority. In August, 1951, after the strike was called and picketing commenced. B.M.E. renewed its demand on Isthmian that it recognize it as bargaining agent and furnished proof that it represented a majority, which resulted in a collective bargaining agreement between B.M.E. and Isthmian. M.E.B.A. was advised of that contract but "has continued to insist that it is the collective bargaining representative of licensed marine engineers employed by plaintiff Isthmian, and has continued picketing Isthmian's vessels," and finally it is alleged, as heretofore quoted, that the picketing arises out of a dispute between M.E.B.A. and B.M.E. While it may have been a dispute between Isthmian and M.E.B.A. alone over the terms of a collective bargaining agreement which initiated the picketing, it has now become a dispute between M.E.B.A. and B.M.E. as to which should represent Isthmian's engineers, and the picketing thus arises out of a dispute between two labor organizations. True, M.E.B.A. wanted certain clauses in a new collective bargaining contract when it called the strike, but now B.M.E. insists on its right to be the exclusive bargaining agent and has a contract, and it follows that the dispute over the terms of a contract drop into the background because M.E.B.A. would have to be the representative of Isthmian's engineers and recognized as such before any effective action could be taken concerning the terms of the contract. That is to say, the dispute is now between it and B.M.E. as to which one shall be bargaining agent for the engineers. M.E.B.A.'s demand for a closed shop and hiring hall necessarily means that it be the exclusive bargaining representative. The facts do not present a case where the employer invoked the interference by another union (B.M.E.) to create a jurisdictional strike situation. On the contrary, B.M.E., as far as appears, acted entirely on its own. Isthmian entered into a contract with B.M.E. because it furnished proof that it represented a ma-

jority of its engineers rather than as a means of creating a jurisdictional dispute. *DeWilde* v. *Scranton Bldg. Trades etc. Council*, 343 Pa. 224 [22 A.2d 897], relied upon by petitioners, is not in point. There Pennsylvania had a law barring injunctions in labor disputes except disputes in disregard or breach of a collective bargaining agreement. An A.F. of L. union claimed it had a contract with the employer and the employer entered into a contract with a C.I.O. union. The court held the exception did not apply because the purpose of it was to protect the employer from activities by the employees or their representatives in violation of an existing agreement between them, that is, to in some measure insure compliance with the contract.

It is contended that the Jurisdictional Strike Law does not apply, because the engineers are supervisory employees; that Isthmian is engaged in interstate commerce, and under the National Labor Management Relations Act of 1947 (29 U.S.C.A. § 141 et seq.) no state can regulate such disputes between such employees and an employer. Reliance is placed particularly on the section reading: "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this sub-chapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." (29 U.S.C.A., § 164[a].) Hence the state law—the Jurisdictional Strike Law—applies. Moreover, it is clear that the claim of petitioners avails them nothing, for accepting their contention, the second clause of the section says that the *employer* shall not be compelled to treat supervisory employees as employees for the purpose of a law, federal or local. The Jurisdictional Strike Act does not compel the employer to so treat his engineers. If any protection would flow from the second clause it would inure to the benefit of the employer rather than the employees or their union.

The writs heretofore issued herein are discharged and the petitioners are remanded to custody.

Gibson, C. J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I reaffirm the views expressed in my dissent in *Voeltz* v. *Bakery & Confectionery Workers, ante,* p. 382 [254 P.2d

553], but wish to point out, in addition, that this case emphasizes the fallacy of the construction placed by the majority on the Jurisdictional Strike Act in the Voeltz case as well as in the case at bar.

Under the collective bargaining agreement between Isthmian and M.E.B.A. that expired on July 15, 1951, preferential hiring was given to members of M.E.B.A. According to the affidavit of Yost, Manager of the Operations Department of Isthmian, for all practical purposes all licensed engineers employed by Isthmian were required to be members of M.E.B.A. B.M.E., however, actively solicited support among M.E.B.A. engineers employed by Isthmian and, in the spring of 1950, about 30 per cent of the engineers preferred B.M.E. and 70 per cent preferred M.E.B.A. The inroads of B.M.E. were probably owing to the fact that all other seamen aboard Isthmian vessels were members of various A.F.L. maritime unions. Isthmian continuously recognized M.E.B.A. as sole representative of the engineers and, as expiration of the 1950-1951 contract neared, negotiated only with M.E.B.A.

M.E.B.A. demanded a hiring hall,[1] which had been obtained from the Pacific Coast steamship companies in 1949 and from nearly all other dry-cargo steamship companies on the Atlantic and Gulf Coasts in June, 1951. Isthmian refused to sign the agreements accepted by the other companies. After negotiations broke down, M.E.B.A. called a strike, July 16, 1951. As conceded by Isthmian on oral argument, the employer at that time considered the strike as a dispute over the hiring hall issue, and *not* as a dispute over which union would represent the licensed engineers aboard the vessels.

When the strike was called, most of the engineers left the vessels. Isthmian promptly replaced them with men willing to pass through the picket lines and recommenced shipping operations. The picketing was peaceful at all times. On the East and Gulf Coasts the A.F.L. longshoremen disregarded the picket lines and normal operations could be had. On the Pacific Coast, however, the independent longshore union respected the picket lines and Isthmian turned to the

---

[1] The requested clause provided: "The Company agrees that when hiring any Licensed Engineer other than the Chief Engineer or a First Assistant Engineer, the employee shall be obtained through the offices of the Association; provided that Engineers so named by the Association shall be qualified to fill the available positions, and further provided that the Company shall have the right to select men who the Company considers qualified and satisfactory."

courts to break the strike. On July 30th, Isthmian sought an injunction in the Superior Court of Los Angeles County on the ground that a strike by supervisors for a closed shop was illegal. No reference whatsoever was made in the complaint to any jurisdictional conflict between M.E.B.A. and B.M.E. The trial court properly dismissed the complaint on August 13th. (*Park & T. I. Corp.* v. *International Brotherhood of Teamsters*, 27 Cal.2d 599, 603 [165 P.2d 891, 162 A.L.R. 1426].)

On August 20th, Isthmian signed a collective bargaining agreement with B.M.E., which now represented a majority of the engineers aboard the vessels. The B.M.E. contract gave members of the B.M.E. preferential employment[2] but did not contain the hiring hall clause that was obnoxious to Isthmian. It is not surprising, of course, that a majority of the engineers expressed preference for B.M.E.; the men loyal to M.E.B.A. had left the ships and the men now sailing the vessels were willing to break the M.E.B.A. strike.

After its unsuccessful efforts in the Los Angeles Superior Court, Isthmian turned to the San Francisco Superior Court for relief against the picketing by M.E.B.A. On August 27th, it filed an amended complaint, the basis of the temporary restraining order involved in the present habeas corpus proceeding. Comparing this complaint with that filed on July 30th in Los Angeles, one discovers that the strike is now alleged to be a jurisdictional strike, a controversy between M.E.B.A. and B.M.E., with Isthmian cast in the role of an innocent employer ground between two rival unions.

Thus at the inception of the strike the only dispute was between Isthmian and M.E.B.A. over the addition of a hiring hall clause upon renewal of a collective bargaining agreement. Isthmian adamantly refused to grant the clause and a strike followed. Over a month after picketing began, Isthmian signed an agreement with a rival union willing to forego the hiring hall demand and to break the M.E.B.A. strike. At the present time, two unions claim the right to represent licensed engineers aboard Isthmian ships: M.E.B.A. representing the men out on strike, and B.M.E. representing the men sailing the ships. The determinative issue in this proceeding is whether under these circumstances the Jurisdic-

---

[2]The clause provided: ''The Company shall have the absolute right to select the Engineers employed by it from among members in good standing of the Brotherhood.''

tional Strike Act allowed the employer to obtain injunctive relief against the union that initially called the strike.

As pointed out in my dissent in *Voeltz* v. *Bakery & Confectionery Workers, ante,* p. 382 [254 P.2d 553], the words "arising out of a controversy between two or more labor organizations" restrict application of the act to cases where the *initial* picketing by the enjoined union is for one of the illegal objectives enumerated in section 1118. For example, Isthmian would be protected if it had renewed the M.E.B.A. contract and B.M.E. thereafter picketed Isthmian to force the employer to break the contract with M.E.B.A. and recognize B.M.E. as having the exclusive right to bargain with Isthmian on behalf of the engineers. Again, the statute would apply if M.E.B.A. picketed Isthmian for the purpose of gaining the exclusive right to perform work aboard the vessels that had previously been performed by the union representing unlicensed engineroom personnel.

The majority, however, as in the Voeltz case, interprets "arising out of a controversy between two or more labor organizations" to apply to conflicts between rival unions that arise during the course of a previously existing and continuing labor dispute between an employer and a single independent union. The result is to prevent unions from peaceful picketing for traditionally recognized objectives of organized labor in all cases where a rival union is willing to offer the employer more pleasing terms than the striking union. Because of the rivalry between various labor organizations,[3] the proposed interpretation of the act would place in the hands of an employer a weapon to enjoin picketing in any industry where the entrenched union has rivals eager to replace it.

Of course, an employer has the right to continue his business behind picket lines and replace the strikers with other workers. And it could be argued that if he should be clearly successful in breaking the strike, so that all of his workers reject the first union and adhere to the second union, the picketing by the first union will no longer arise out of the original cause of the strike. Then, perhaps, the supplanting union would be the one entitled to deal with the employer and the first union, continuing picketing when its cause is hopeless, would be the one interfering and causing the jurisdictional strike. But this problem is not presented here,

---

[3] At least three unions compete for organization of licensed marine engineers: M.E.B.A., B.M.E., and United Mine Workers, Local No. 50.

where the only issue on habeas corpus is the propriety of issuance of the temporary restraining order violated by petitioners. At the time that order was issued, it is undisputed that M.E.B.A. had not lost the strike and, accordingly, the picketing still arose from the dispute between M.E.B.A. and Isthmian.

In conclusion, I believe that the Jurisdictional Strike Act was designed to protect an employer from the effects of a struggle between two or more unions, either for recognition as bargaining agent or for a determination of which has the exclusive right to perform certain work, in which the employer is an innocent party. I do not believe that the statute was ever meant to protect an employer who is engaged in a dispute with his employees and the union of their choice over legitimate labor objectives, and who seeks a ban on otherwise lawful picketing on the ground that he has signed a contract with another union willing to fill the jobs of the striking workers, thereby himself creating the "jurisdictional dispute" from which he seeks relief.

In my opinion the petitioners should be released.

Traynor, J., concurred.

Petitioners' application for a rehearing was denied April 2, 1953. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.