[L. A. No. 28535. In Bank. Jan. 27, 1966.]

GEORGE SMYRNIOTIS et al., Plaintiffs and Respondents, v. LOCAL JOINT EXECUTIVE BOARD OF HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION OF LONG BEACH AND ORANGE COUNTY, et al., Defendants and Appellants.

**32**

Gyler & Gottlieb and Emanuel Gyler for Defendants and Appellants.

James P. Zarifes for Plaintiffs and Respondents.

TOBRINER, J.—Predicating its action upon the Jurisdictional Strike Act (Lab. Code, § 1115 et seq.) hereinafter called the Act, the trial court issued a preliminary injunction ordering defendant union to cease picketing plaintiffs' restaurant. Defendants appeal from that order, contending that the enjoined conduct does not constitute concerted activity "arising out of a controversy between two or more labor organizations" and that, consequently, the Act does not apply.

We hold that since the picketing originated in a dispute between a labor organization and an employer over the terms and conditions of employment, such picketing cannot become a dispute "arising out of" a jurisdictional dispute solely because of the belated appearance of another union which asserts that it represents the employees. Although the course of subsequent events over a period of time may show that a particular strike has failed and that a jurisdictional dispute has arisen in its place, the record in this case contains no indication that such fortuities happened here. Since the record does not show that the original strike terminated and that a jurisdictional dispute intervened, the injunction should not have issued.

The facts appear from the affidavits submitted by the parties: the plaintiffs, hereinafter called the Employer, are the owners of a restaurant called the Olympia Cafe. The defendants, hereinafter called the Union, are labor organizations which represent, among others, restaurant workers. On July 9, 1957, the parties entered into a collective bargaining agreement prescribing the terms and conditions of employment for those employed at the Olympia Cafe. The agreement contained a union-security provision requiring all employees to join the Union within 31 days after commencement of employment. The contract also required the Employer to pay monthly contributions to the Long Beach and Orange County Culinary Workers and Bartenders Welfare and Retirement Fund, hereinafter called the Fund.

By a letter dated November 30, 1960, the Employer purported to terminate the collective bargaining agreement as of February 1, 1961. The collective bargaining agreement pro-

vided that unless either party gave notice of termination at least 60 days prior to February 1, 1961, the agreement would automatically renew on that date for successive one-year periods. The letter, addressed to the Fund, indicated that the Employer would pay past due obligations to the Fund as soon as possible and that the communication was to serve as the 60-day notice of termination required by the terms of the contract. The letter concluded with the following: "We shall pay Union wages and as you are aware we pay our cooks above scale and shall continue to do so. We are not against union's [sic] we think they are necessary but, in order to stay in business we cannot continue with the Welfare Fund."

The Employer apparently ceased making payments to the Fund after January 1961. On August 23, 1961, the Fund instituted a suit against the Employer to recover the February through July payments. In that suit the Employer filed an answer setting forth the above letter and alleging that it effectively terminated the Employer's obligation under the collective bargaining agreement. The Fund claimed never to have received the letter. In a judgment rendered on July 25, 1962, however, the court ruled that the letter effectively terminated the agreement. Thus, although the Employer sent the letter on November 30, 1960, the Union became aware of it some time after August 1961; the court's ruling that the contract had expired on February 1, 1961, could have come to the Union's attention only after July 25, 1962.

Immediately after the above adjudication, representatives of the parties met to discuss a new contract. On August 8, 1962, the Employer and representatives of the Union entered into negotiations; the Union spokesmen asked the Employer to sign a collective bargaining agreement identical to the expired contract on pain of suffering a strike. Plaintiff Smyrniotis' affidavit declares that he refused to sign because he doubted the good faith of the Union in view of the fact that the Fund had appealed from the above-mentioned judgment. The affidavit of a Union representative indicates that Smyrniotis said that he would sign the contract if the Union would waive all indebtedness to the Fund and that the representative told him that only the Fund, which was independent of the Union, could give such a waiver. On August 10, 1962, the Union called on Smyrniotis and again threatened a strike if he did not agree. Smyrniotis again refused.

On the following Monday, August 13, 1962, the Union struck. The Union called its members off the job and picketed the Employer's restaurant. The Union told the employees of the restaurant that those who remained at work were no longer members in good standing. Picketing continued until December 20, 1962, when the superior court issued the restraining order in the instant case.

The restaurant remained open despite the strike. The Employer hired replacements to fill the positions of the strikers. Because union drivers refused to cross the picket line, the Employer delivered its own supplies from wholesalers. The Employer alleges a loss of $500 a day as a result of the picketing.

On October 15, 1962, two months after the strike began, some of those then employed by the Employer formed a labor organization called Olympia Restaurant Employees Union, hereinafter called the Olympia Union. This organization claimed to represent a majority of those then employed by the Employer. The Olympia Union asked the Employer to sign a collective bargaining agreement with it.

On December 14, 1962, the Employer agreed to enter into a collective bargaining agreement with the Olympia Union. The contract provided that the Olympia Union would be the exclusive bargaining agent of all employees of the Olympia Cafe; it required all employees to join the union within 31 days of employment. Under the heading "Employer Contribution to Group Health and Accident Insurance, etc." the contract states that the parties "agree in principle" that the Employer should pay for such insurance and that if the Employer does not accept a union proposed plan the parties agree to negotiate it; the contract, however, does not obligate the Employer to pay anything.

Likewise on December 14, 1962, the Employer notified the Union by letter of the fact of the collective bargaining agreement with the Olympia Union. The Employer requested that defendant Union cease picketing and threatened to seek an injunction. The Union continued picketing.

On December 20, 1962, the Employer sought and obtained a temporary restraining order forbidding further picketing by the Union; on May 28, 1963, the court issued a temporary injunction. The court rested both of these orders on the Act and general principles of equity.

In summary, the facts disclose that the Union called a strike as a result of the Employer's refusal to renew an

expired collective bargaining agreement. Two months later, those then employed by the Employer formed a labor organization. Two months after that occurrence, the Employer signed a collective bargaining agreement with the new organization. On these facts the superior court found a "jurisdictional strike" and enjoined the Union's picketing.

The legislative motivation for adoption of the Act obviously lay in the inequity visited upon an employer helplessly caught in the throes of an internecine union struggle for which he was not responsible as well as in the social cost which such a dispute entailed. Although the number of jurisdictional strikes and their damaging effect may have been exaggerated in the public consciousness, the indefensible nature of such contests led to their widespread restriction. As Professor Aaron points out, the year 1947 produced a variety of laws aimed at such strikes; "Not only did the Labor-Management Relations (Taft-Hartley) Act include several provisions dealing with this problem, but eight states, including California, also enacted laws on the subject." (Aaron, *The California Jurisdictional Strike Act* (1954) 27 So.Cal.L. Rev. 237, 239, footnotes omitted.)

The structure of the California Act is both deceptive and simple. It incorporates two different parts of the Taft-Hartley Act and joins them in an "incongruous whole" (Meiners, *Jurisdictional Disputes in California* (1960) 11 Hastings L.J. 424).[1] It seeks to accommodate two purposes that often may conflict: the protection of the union in its traditional use of concerted activity to improve wages and working conditions and the protection of the public by the restriction of that activity in case of the involvement of competing unions. In regard to protected union activity, *Petri Cleaners, Inc.* v. *Automotive Employees etc. Local No. 88* (1960) 53 Cal.2d 455, 471-472 [2 Cal.Rptr. 470, 349 P.2d 76], recognizes that the Act "was designed, not to diminish free competition between labor and industry, but to release an innocent employer caught between the rival claims of two or more labor organizations." In regard to competition between two unions, the Act fails to resolve the basic issue which engenders such a dispute if it is a bona fide one. The Act provides no machinery whatsoever for informing the

[1]California Labor Code section 1118 incorporates the substance of section 8(b)(4)(D) and 9(a) of the Taft-Hartley Act (29 U.S.C. § 141 et seq.).

employer as to which of the truly competing unions he should recognize as the bargaining representative of his employees.

As we have said, the underlying statutory scheme is simple. Section 1115 declares jurisdictional strikes "to be against the public policy of the State of California and . . . to be unlawful." Section 1116 provides: "Any person injured or threatened with injury by violation of any of the provisions hereof shall be entitled to injunctive relief therefrom in a proper case, and to recover any damages resulting therefrom in any court of competent jurisdiction."

Section 1118 contains the statutory definition of a jurisdictional strike: "As used in this chapter, 'jurisdictional strike' means a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer." ▮▮▮ Thus the statute proscribes concerted activity which arises out of two different kinds of controversies. The first, often referred to as a representation dispute, constitutes a controversy as to which union shall represent a given group of employees. The second, usually called a work assignment dispute, is a dispute as to which of two unions' members should perform particular work.

▮▮▮ Although the statute seeks to avoid the undesirable effects of jurisdictional strikes it specifically affirms the right of employees to participate in concerted activity; it attempts to prevent employers from misusing the statute to abridge those rights. Section 1119 provides: "Nothing in this chapter shall be construed to interfere with collective bargaining subject to the prohibitions herein set forth. . . ." ▮▮▮ Section 1117 aims to prevent employers from utilizing a company-dominated union to create a jurisdictional strike; it, accordingly, excludes from the definition of a labor organization any organization which is "financed . . . interfered with, dominated or controlled by the employer."

▮▮▮ The key language that determines the applicability of the Act to the instant case is the requirement that the "concerted interference" with the employer's business must

arise out of a "controversy between two or more labor organizations as to which of them" has, or should have, the right to bargain collectively with, or perform work for, the employer. The words "arising out of a controversy" must mean that the interference originate in a jurisdictional dispute. The interference then issues from the dispute between the two unions as to which should represent the employees or perform the work; it emanates from "pre-existing, multiunion quarrels for power. . . ." (Margolin, *Duties and Rights of California Unions: A Study in Policy Changes* (1959) 11 Hastings L.J. 23, 44.) We have no doubt that the present strike did not so originate.

This strike arose out of a disagreement between the Employer and the Union which, at the time, indisputably represented plaintiffs' employees; at that point no rival union so much as existed. Until shortly before the strike the Union believed a collective bargaining agreement between the parties remained in effect; upon learning of the above-mentioned adjudication that the agreement had been terminated, the Union immediately sought a contract identical to the antecedent agreement. The Employer refused, except upon the condition that the Union waive the Employer's obligations to the Fund; the letter of termination further indicates that the Employer opposed any provision for welfare payments to its employees. Thus the uncontradicted facts establish that the strike which commenced on August 13th arose out of a controversy between the Union and the Employer over the terms and conditions of employment.

The record discloses the parties' long prior history of collective bargaining. It shows that the strike centered upon the issue of the Employer's refusal to contribute to the Fund. It demonstrates that, some four months later, the Employer signed a contract with a second organization, which claimed then to represent his employees, but that contract did not contain the disputed provision. This record hardly proves that at the moment of concord between the Employer and the Olympia Union the wage strike became one that originated in a dispute between two unions.

The reason why the employees at the execution of the Olympia Union agreement agreed to the modified contract is quite apparent. Those employees then working were either replacements for the striking members of the Union or former employees who crossed the picket line. Since these employees were willing to work on terms that did not include

welfare benefits, they obviously would not object to a contract omitting such benefits.

Since the picketing here clearly arose out of a disagreement between Union and Employer over the terms and conditions of employment, the Employer's attack upon it must rest on the contention that the subsequent organization of a second union by the employees of that date and the Employer's recognition of that union converted an otherwise legitimate strike into one "arising out of" a jurisdictional dispute. For this proposition the Employer relies on *Voeltz* v. *Bakery etc. Union* (1953) 40 Cal.2d 382 [254 P.2d 553], and *In re Kelleher* (1953) 40 Cal.2d 424 [254 P.2d 572]. Although these cases perhaps lend support to the Employer's position, such an interpretation of the Act, as we explain, ignores the words of the statute as well as its policy.

In *Voeltz* an AFL Bakery Workers Union claimed to represent the company's employees and demanded of the management a collective bargaining agreement embodying improved wages, hours and conditions of work. Upon the management's refusal, the union called a strike and established a peaceful picket line. When 10 of the 49 employees joined the strikers, the employer hired replacements. Although the strike continued, an independent union composed of nonstriking employees appeared 11 months later; it asserted that it represented the majority of the current employees. The employer sought an injunction pursuant to the Act; the superior court issued it.

The majority opinion in *Voeltz* stated: "We do not believe that the fact that a dispute existed between defendants and plaintiff before the [independent union] was formed and came into the picture, takes the case out of the act requiring that the interference with the employer's business arise out of a controversy between unions, for after [it] was formed and plaintiff's employees became members thereof, it endeavored to have defendants withdraw from the arena and to induce plaintiff to bargain with it exclusively, yet defendants continued their activities. interfering with plaintiff's business. It may be inferred that what began as a dispute between employer and the union became a dispute between unions as to which should be exclusive bargaining agent." (40 Cal.2d 382, 386-387.)

In *In re Kelleher, supra,* the employer steamship company, prior to the controversy, had recognized, and contracted with, a CIO union which represented marine engineers. At the expiration of that contract, the union requested a new

agreement providing for a hiring hall and union shop. The employer refused; the union struck. The employer then hired new workers to replace the strikers. Subsequently, an AFL union of marine engineers claimed to represent those then employed by the steamship company. Recognizing the AFL union, the employer entered into a collective bargaining agreement with it; the agreement did not contain hiring hall or union shop provisions. The employer then obtained an injunction restraining the picketing by the CIO union.

In *Kelleher* the court framed the issue so as to present essentially the same question as in *Voeltz* and, similarly, held that "While it may have been a dispute between [the employer] and [the first union] alone over the terms of a collective bargaining agreement which *initiated* the picketing, it has now become a dispute between [two unions] as to which should represent [the employees] and the picketing thus arises out of a dispute between two labor organizations." (40 Cal.2d 424, 428; italics added.)

The reasoning of these decisions, in effect, ignores the crucial limitation of the Act that the prohibited jurisdictional strike is a "refusal to perform work for an employer" or "interference" with his business "arising out of a controversy between two or more labor organizations as to which of them" should have the right to bargain collectively with, or perform work for, an employer. The opinions presume that, whatever the legitimate cause and origin of the strike, the Act mechanically applies when and if a second union presents to the employer a conflicting claim of representation. The advent of the adversary union's assertion of representation apparently dispatches the union-employer dispute.

Justice Carter exposes the precise weakness of this position. In his dissent in *Voeltz* he explains that because the Act "does not contain certification procedure" the "majority resolves this difficulty by applying the statute to *all* unions making claims for the right to represent the employees." (40 Cal.2d 382, 390.) Thus the majority opinion allows the employer either to contract with the union that offers him the best terms and to enjoin interference from other unions or "to enjoin picketing by both unions and gain perpetual freedom from concerted labor action." (*Id.*) The result of this reasoning, as Justice Carter points out in his *Kelleher* dissent, is to immunize and "to protect an employer who is engaged in a dispute with his employees and the union of their choice over legitimate labor objectives, and who seeks a

ban on otherwise lawful picketing on the ground that he has signed a contract with another union willing to fill the jobs of the striking workers, thereby himself creating the 'jurisdictional dispute' from which he seeks relief.'' (40 Cal.2d 424, 433.)[2]

As a final rationalization for positing the application of the Act upon the appearance of the second union, the *Voeltz* and *Kelleher* majorities raise the questionable argument that any other construction of the Act would render it inoperative except in the case of the simultaneous demands of two competing unions. Such an interpretation must rest upon a debilitating chronological concept that the claims must be concurrent. ▮ Yet the Act could very well apply to a situation in which one union urged a claim of representation later in time than the first. The factor of time is, indeed, relevant, but not controlling. The test must turn upon the *nature* of the dispute: whether or not the union's action *arose* out of a jurisdictional dispute. To the extent that *Voeltz* and *Kelleher* establish a test for the application of the Act which rests solely upon the presentation of a claim of the second union that it represents the employees, these cases are overruled.[3]

---

[2]Thus a commentator has pointed out: ''A legitimate union with a long history of labor negotiations behind it may enter upon a strike for what are admittedly lawful objectives and find itself suddenly enjoined, not because of anything it did or could avoid doing, but merely because the employer, at his will, invoked the claims of a rival union thereby creating a 'jurisdictional' dispute. . . . This would mean that the union which is more aggressive, more active and, therefore, least acceptable to the employers, could be eliminated. . . . In the hands of the employer who regards union activity as a paralytic agent, the Jurisdictional Strike Act has become akin to a 'super Salk Vaccine,' enabling him to inject dead labor anti-bodies into the dispute in order to forestall any live bargaining in his plant.'' (Margolin, *Duties and Rights of California Unions: A Study in Policy Changes, supra,* 11 Hastings L.J. 23, 47.)

[3]We have found only two other cases which apply the incorrect rule of *Voeltz* and *Kelleher: Isthmian S.S. Co.* v. *National Marine etc. Assn.* (1953) 40 Cal.2d 433 [254 P.2d 578], and *Globe D. Lunch Co.* v. *Joint Culinary Workers* (1953) 117 Cal.App.2d 190 [255 P.2d 94]. *Isthmian,* decided the same day as *Voeltz* and *Kelleher,* arose out of the same facts as *Kelleher* and followed the same reasoning. *Globe D. Lunch* v. *Joint Culinary Workers, supra,* involved the following facts: the defendant Culinary Workers picketed plaintiff's place of business seeking recognition as the exclusive bargaining agent of plaintiff's employees after plaintiff had entered into such an agreement with an independent association of plaintiff's employees. The Culinary Workers, seeking a similar agreement, had also unsuccessfully picketed plaintiff at an earlier time. The court in rejecting the contention that the strike did not arise out of a jurisdictional dispute, held that it was bound by *Voeltz.* To the extent that these cases are contrary to today's holding *Isthmian* is overruled and *Globe* disapproved.

In some instances a wage dispute may, indeed, lose its force and terminate; a bona fide jurisdictional strike may follow it. ■ But the policy of the Act can be best effectuated by a consideration of *all* the factors relevant to whether the "concerted interference" to be enjoined is one "arising out of a controversy between two or more labor organizations." Such an analysis should determine whether the original dispute is still alive; it should encompass the bargaining history of the union and the employer, the origin and nature of the dispute, the time sequence of that dispute, the union or employee interest and activity in that dispute, the status of the second union, the membership of the unions, the expressions of the employees, and all other pertinent factors.[4] The construction given to the Act in *Voeltz* and *Kelleher* ignores any fact but the appearance of a second union. It assumes that intervention of a second union automatically produces a jurisdictional strike which arises like the phoenix from the ashes of the wage dispute.[5]

■ The instant record does not support the proposition that the wage dispute had concluded and that the present

[4]Although the instant matter was decided on the basis of affidavits, this method is particularly unsatisfactory in the resolution of such an issue as whether the Olympia Union was employer-dominated. Despite the conflict in the parties' affidavits regarding the Employer's participation in the formation of that union, the trial judge found that the union was not employer-dominated. The defendants did not challenge this finding on appeal. We point out, however, that the factfinding process of trial is far more appropriate than the imprecise weighing of affidavits. As Aaron, *The California Jurisdictional Strike Act, supra*, 27 So.Cal.L. Rev. 237, 261, points out: "When, as it frequently happens, the issue is whether there is a bona fide rival union in the picture or whether the employer has merely sought to turn a collective bargaining dispute with one union into a pseudo-jurisdictional controversy, in order to obtain injunctive relief, an attempt to arrive at the truth by studying contradictory affidavits is particularly frustrating."

The trial court made no finding on the relative number of employees who struck on August 13th or on the number who voluntarily joined the Olympia Union. Although these figures would not be relevant under the *Voeltz* and *Kelleher* test that a claim of representation by a second union is sufficient to invoke the Act, such facts, although by no means controlling, would be pertinent to complete the total picture.

[5]"The practical result is that an injunction is available against whichever union is unwilling to forego a more beneficial contract. . . . The primary purpose of jurisdictional and representation dispute legislation is to provide the employer with protection against undesirable union activity and, at the same time, to protect the union which represents a majority of the employees or has the most valid claim to a work assignment. The construction given the California statute appears to vitiate the latter purpose; the employer is not only protected from objectionable union practices, but he is also handed a powerful instrument against legitimate union activity." (Comment, *California Jurisdictional Strike Act* (1953) 6 Stan.L.Rev. 183, 188.)

strike arose from a jurisdictional dispute. The Union had been picketing for only four months; nothing in the record indicates that the Union did not continue to picket in response to the Employer's refusal to sign a contract providing for welfare benefits. The formation of the second union, composed of those willing to cross the picket line, did not alone convert the legitimate strike into a jurisdictional dispute.

We conclude that the application of the Act in the instant case would necessarily rest upon an assumption that the Legislature intended the Act to serve as a weapon in an employer's arsenal for use at a propitious moment for strike breaking purposes.

The order granting the preliminary injunction is reversed.

Traynor, C. J., Peters, J., Peek, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Presiding Justice Roth in the opinion prepared by him for the District Court of Appeal in *Smyrniotis* v. *Local Joint Executive Board* (Cal.App.) 44 Cal.Rptr. 600.