NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SIGNAL OIL AND GAS COMPANY,
Respondent.

No. 19221.

United States Court of Appeals
Fifth Circuit.

June 22, 1962.

Stuart Rothman, General Counsel, Glen M. Bendixsen, Attorneys, National Labor Relations Board.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Assoc. Gen. Counsel, N.L.R.B., Rosanna A. Blake, Atty., N.L.R.B., Washington, D. C., for petitioner.

W. D. Deakins, Jr., Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., for respondent.

George W. Liskow, Lake Charles, La., for Intervenor, Employees' Representation Federation.

Before TUTTLE, Chief Judge, and HUTCHESON, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is an enforcement proceeding by the National Labor Relations Board against Signal Oil and Gas Company. The Board found that the Company interfered with employees' rights in violation of Section 8(a) (1) and (2) of the National Labor Relations Act (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.). The finding of an unfair labor practice was based on the Company's entering into a collective bargaining agreement with an "incumbent" union while a real question existed as to whether that union represented a majority of the em-

ployees. 131 NLRB No. 175. We affirm the Board and grant enforcement of its cease and desist order.[1]

Signal Oil operates a refinery at Houston, Texas, where it employs five hundred to six hundred employees. When Signal Oil acquired this refinery from Eastern States Petroleum and Chemical Corporation in September 1959 it took over an existing labor contract expiring August 5, 1960. The incumbent union, the Employee Representation Federation (the Federation), had represented the employees for approximately ten years. In June 1960 the Oil, Chemical and Atomic Workers International Union, Local No. 4–227 (the Union) began an organizational campaign among the employees. A union representative testified that once or twice a month the Union distributed five or six hundred leaflets to the workers on the Company premises. It also made other efforts to recruit members. Meanwhile, the deadline for a new labor contract was approaching. The Company began negotiations with the Federation at the end of July and reached a final agreement August 4. The contract was to be typed overnight and signed the next day. At 8:30 A.M. August 5 the Union delivered a letter to the Company stating that the Union represented a majority of the "production and maintenance employees". At 9:15 A.M. the Union filed a petition for a representation election with the Houston Office of the National Labor Relations Board and requested that the Company recognize and bargain with the Union with respect to the employees "in that unit." Fifteen minutes later the Company signed the new labor contract, and during the day it was signed by representatives of the Federation. The contract was ratified ten days later by a majority of the employees, although ratification was not a condition precedent to the effectiveness of the agreement.

At the N.L.R.B. hearing the Federation president stated that when the Union petitioned for an election, "[w]e were undecided * * * how the majority of our people stood, whether they were behind our Federation or whether they were behind OCAW." He said that the Federation's headquarters were located at the Company plant, where he was given the use of a desk, telephone, and filing cabinet owned by the Company. While president of the Federation he spent about half of his working time on Federation affairs. Prior to being challenged by the rival union, the Federation had never collected dues or obtained authorization cards from its "members". After the Union petitioned for an election, the Federation began to collect authorizations from employees in an attempt to determine whether the Union had the backing of thirty per cent of the employees, as was required to support its petition for an election. The Federation did not distribute membership cards or begin to collect dues until just before the N.L.R.B. proceeding in November 1960.

■■ It is a tenet of the National Labor Relations Act that the employer is not to meddle in labor union affairs. 29 U.S.C.A. § 158(a) (2) provides that it shall be an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." Under the Midwest Piping rule, 63 NLRB 1060 (1945), an employer faced with rival representation claims is required "to maintain a strictly neutral position and not to bargain with any union as to the employees involved in the representation dispute." Local 483, Inter. Bro. of Boilermakers Iron Ship Builders, Blacksmiths, Forgers and Helpers of America, AFL–CIO v. N.L.R.B., 109 U.S.App.D.C. 382, 1961, 288 F.2d 166, 168, cert. denied,

1. The Board's order directed Signal Oil to withdraw its recognition of the Employees Representation Federation as the representative of its employees, to rescind the collective bargaining agreement between it and the Federation, to refrain from activities that would interfere with its employees' rights to organize, and to post notices to inform its employees of its actions.

368 U.S. 832, 82 S.Ct. 55, 7 L.Ed.2d 34. Execution of a contract with a union does constitute support of it, since "once an employer has conferred recognition on a particular organization it has a marked advantage over any other in securing the adherence of employees, and hence in preventing the recognition of any other." N.L.R.B. v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 268, 58 S.Ct. 571, 82 L.Ed. 831. Employers who have entered a collective bargaining agreement with a union when a real question as to representation existed have been held responsible for committing an unfair labor practice. Dixie Bedding Manufacturing Co. v. N.L.R.B., 5 Cir., 1959, 268 F.2d 901; N.L.R.B. v. National Container Corp., 2 Cir., 1954, 211 F.2d 525.

The evidence supports the Board's finding that a serious question as to representation existed, which imposed on the Company a duty to postpone collective bargaining until it could ascertain which organization was the actual representative. It is apparent that on August 5 nobody really knew whether the Federation commanded the allegiance of a majority of the employees. There was no way to identify and count its members, and it is a safe guess that many of the employees did not actually consider themselves members of either organization. The ballots had not all been cast. Under these circumstances, the employer was required to avoid giving recognition to one of the competing organizations. Since the situation had not crystallized, the influence interjected by execution of a labor contract between the employer and one of the unions could tip the scales, depriving the employees of their right to select their representative in a free contest between the rival organizations.

The company argues that it was not obligated to postpone the contract on the basis of the Union's bald, undocumented assertion of majority status. N.L.R.B. v. North Electric Company, 6 Cir., 1961, 296 F.2d 137. It contends that it had no prior knowledge of the Union's activities, and though this contention strains credulity a bit, it is not disproved by the evidence. Nevertheless, the contention will not stand. This case lies in the shadow of the recent Supreme Court decision, International Ladies Garment Workers Union, AFL–CIO v. N.L.R.B., 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed. 2d 762. There the Court held that an employer had committed an unfair labor practice by entering into a collective bargaining agreement with a union that did not represent a majority of the employees, even though the employer did so in a good faith belief that the union had majority support. In holding that good faith was no defense, the Court stated:

"We find nothing in the statutory language prescribing scienter as an element of the unfair labor practices here involved. The act made unlawful by § 8(a) (2) is employer support of a minority union. Here that support is an accomplished fact. More need not be shown, for, even if mistakenly, the employees' rights have been invaded. It follows that prohibited conduct cannot be excused by a showing of good faith." 81 S.Ct. at 1608, 6 L.Ed.2d at 768.

This decision places on the employer a duty to take reasonable steps to verify the representation claims of the union with which it proposes to negotiate a collective bargaining agreement.[2] In announcing its decision, the Court emphasized that no penalty was imposed on an employer who commits an unfair labor practice by good faith mistake. He is required simply to undo his wrongful action and allow the employees to select

2. The Court stated: "If an employer takes reasonable steps to verify union claims * * * he can readily ascertain their validity and obviate a Board election. We fail to see any onerous burden involved in requiring responsible negotiators to be careful, by cross-checking, for example, well analyzed employer records with union listings or authorization cards. Individual and collective employee rights may not be trampled upon merely because it is inconvenient to avoid doing so." 6 L.Ed.2d at 768–769.

their representative free from improper influence.

In short, when an employer is faced with conflicting claims of rival unions and a serious question exists as to which union represents a majority of employees, the employer must adhere to a policy of strict neutrality. The employer must withhold recognition of either union, until the rivalry is settled at the polls in a Board-conducted, secret election.[3]

We affirm the findings of the Board and grant enforcement of its order.

3. An employer who is faced by rival claims can both protect himself from possible unfair labor practice findings and speedily bring an end to the stalemate in the bargaining process, for Section 9(c) (1) of the Act empowers him to file a petition for an election under such circumstances. Cf. Brooks v. N. L. R. B., 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125; International Ladies Garment Workers Union, AFL–CIO (Bernhard-Altmann) v. N. L.

R. B., 366 U.S. 731, 739–740, 82 S.Ct. 1603, 6 L.Ed.2d 762. Furthermore, until the Board determines that a question concerning representation does not exist, an employer faced with "possible legal jeopardy under the Midwest Piping doctrine" can refuse to bargain with the incumbent union without violating its duty to bargain under Section 8(a) (5). National Carbon Division, 105 NLRB 441, 443.