[S.F. No. 22934. In Bank. Dec. 29, 1972.]

R. T. ENGLUND et al., Plaintiffs and Respondents, v.
CESAR CHAVEZ et al., Defendants and Appellants.

(And 8 other cases.) *

*Eckel Produce Co. v. Chavez (S.F. No. 22935); Merit Packing Co. v. Chavez (S.F. No. 22936); Garin Co. v. Chavez (S.F. No. 22937); Growers Exch., Inc. v. Chavez (S.F. No. 22938); Stewart Packing Co. v. Chavez (S.F. No. 22939); Oshita, Inc. v. United Farm Workers Organizing Committee, AFL-CIO (S.F. No. 22940); Mann Packing Co. v. Chavez (S.F. No. 22941); Furukawa Farms, Inc. v. Chavez (L.A. No. 30046).

## COUNSEL

Haight, Lyon & Smith, George C. Lyon and Harold H. Brown for Plaintiffs and Appellants.

Cohen, Farnsworth, Denison & Carder, Cohen, Farnsworth, Denison, Carder & Engelhardt and William H. Carder for Defendants and Appellants and for Defendants and Respondents.

Abramson & Church, Pioda, Stave, Bryan, Ames & McInnis, Robert H. Ames, Noland, Hamerly, Etienne & Fulton, Nolan, Hamerly, Etienne & Hoss and James D. Schwefel, Jr., for Plaintiffs and Respondents.

## OPINION

**THE COURT.**—The numerous actions consolidated before our court in the instant proceeding arose out of union organizational activities among agricultural field workers in California's Salinas and Santa Maria Valleys in the summer of 1970. Although the factual details of the resulting labor disputes in the two geographically distinct valleys vary in some respects, all of the cases present a common legal question as to the proper application of California's Jurisdictional Strike Act. The issue is whether an employer who grants exclusive bargaining status to a labor organization which he knows does not actually represent a substantial number of his workers may thereafter obtain injunctive relief against concerted activities of a competing union. The two superior courts which ruled on this question in the cases before us reached conflicting conclusions as to the availability of the Jurisdictional Strike Act remedy in this situation, and we granted a hearing to settle this novel and important question of state labor law.

For the reasons discussed more fully below, we have concluded that the Jurisdictional Strike Act (hereafter the Act) does not authorize injunctive relief under these circumstances. We shall point out that although the Act was generally intended to protect an employer caught between the con-

flicting demands of two competing unions, the Legislature, in drafting its provisions, was aware of the danger that an employer might attempt to convert the Act from a defensive shield against improper union rivalry into an affirmative weapon which could be utilized selectively to eliminate the less favored or more feared of the two competing unions. To preclude such a perversion of the Act's operation, the statutory provisions, building on the federal model, withhold the state's injunctive power whenever an employer has "financed," "dominated," "controlled" or *"interfered with"* either of the competing labor organizations.

In interpreting such language in the federal act, the federal courts have uniformly held that an employer's recognition of a minority union as the exclusive bargaining agent of his employees constitutes an improper "interference with" a labor organization proscribed by federal law. In light of the similarity of the language and underlying policy of the state provision, we have determined that the Legislature intended an equivalent interpretation of the Jurisdictional Strike Act. We therefore conclude that in order to obtain relief under the Jurisdictional Strike Act an employer must maintain a strict neutrality between competing unions, and that he can resort to the Act after recognizing one union as the exclusive bargaining agent of his employees only if, at the time of recognition, he entertained a reasonable, good faith belief that such union was in fact the desired representative of his employees.

### 1. *The facts of the instant proceeding.*

The present consolidated proceeding encompasses 9 separate actions, commenced by more than 35 growers and shippers of agricultural products against the United Farm Workers Organizing Committee (hereafter UFWOC or Farm Workers) and several of UFWOC's individual officers, including Cesar Chavez. Eight of these actions, instituted by 27 growers from the Salinas Valley in the Superior Court of Monterey County, involve virtually identical facts and will hereafter be referred to collectively by the title of the lead case of this group, *Englund* v. *Chavez*. The ninth action, *Furukawa Farms, Inc.* v. *Chavez,* filed in the Superior Court of Santa Barbara County, arose out of union organizational activities in the Santa Maria Valley. Although the events in Santa Maria occurred contemporaneously with the Salinas Valley activities, the histories of the two labor disputes differ in several respects. We begin with a description of the Salinas Valley matter.

### (a) *The Englund v. Chavez cases.*

The 27 Salinas Valley growers and shippers (hereafter Salinas Valley Growers or Growers) who instituted these actions are all members of the

Grower-Shipper Vegetable Association of Central California (hereafter Vegetable Association), an organization certified as an appropriate multi-employer bargaining unit by the National Labor Relations Board. For many years the Western Conference of Teamsters (hereafter Teamsters) had represented the truck drivers and packing shed workers employed by each of the Salinas Valley Growers; prior to July 1970, however, the Teamsters had never represented any of the agricultural field workers of the 27 growers involved in this litigation.

The events which ultimately led to the instant lawsuits began in June and July 1970, while the Teamsters and Vegetable Association were re-negotiating a truck drivers' contract which was to expire on July 15, 1970. According to the affidavits of William Grami, the Teamsters' bargaining representative, and Andrew Church, the Vegetable Association's bargaining representative, during the course of these negotiations over the truck drivers' contract, Grami indicated to Church that the Teamsters were additionally interested in negotiating exclusive industry-wide collective bargaining agreements covering all *the field workers* in, and beyond, the Salinas Valley. Grami's declaration explains that the Teamsters' interest in representing the field workers stemmed primarily from that union's representation of truck drivers and food processing workers, employees who would be ad-versely affected if the field workers went on strike; he related that "the Teamsters intended to protect these members by protecting the flow of goods from growing through distribution."

Although Grami's affidavit indicates that during the June and July ne-gotiations he had cautioned the Salinas Valley Growers, in general terms, that the Teamsters "would fight to take in the field workers," both Grami and Church stated explicitly that neither the Teamsters nor the Growers considered the question of field workers' representation to be an issue which had to be resolved during the current truck drivers' contract talks. When the parties thereafter failed to reach an accommodation on the truck drivers' contract by July 15, the Teamsters struck—over the terms of the contract alone—and severely impaired the Salinas Valley Growers' conduct of their businesses. A week later, the Vegetable Association and the Teamsters reached an agreement on the terms of the truck drivers' contract, and the strike was terminated.

On July 23, 1970, at a general membership meeting of the Vegetable Association, the new truck drivers' contract was ratified by all of the Associ-ation members. According to the uncontradicted affidavit of Cal Watkins, the personnel manager of Inter Harvest, Inc. (a grower member of the Association) who attended the July 23d meeting, the Association members,

after the completion of the ratification vote, discussed the question of Teamster representation of their field workers. The members decided to appoint a committee which was to approach the Teamsters to "feel out" that union on the prospects of negotiating an agreement recognizing the Teamsters as the exclusive bargaining agent of the Growers' field workers. There is no suggestion in the record that the Growers, before taking such a step, attempted to ascertain whether their respective field workers desired to be represented by the Teamsters, or, indeed, that the question of their field workers' preference was even raised as a relevant consideration.

The Association committee which had been established to approach the Teamsters worked quickly. On the following day, July 24, 1970, at another general membership meeting of the Vegetable Association, the committee reported that the Teamsters had been contacted and were "interested and receptive"; indeed, the committee informed the membership that any grower who wished could sign an immediate recognition agreement designating the Teamsters as the exclusive bargaining agent for all of his field workers. Each of the 27 Salinas Valley Growers involved in the instant litigation signed such an agreement that same day, on a form made available by the Teamsters. Once again, there is no indication that any thought was given to the possible wishes of the field workers whose interests were purportedly to be represented by the Teamsters.

The next day negotiations for formal contracts began between the Teamsters and the Growers. The Growers concede that during these negotiations the Teamsters did not claim to be authorized to represent any of their field workers; instead, they acknowledge that the union indicated only that it would *thereafter* assume responsibility for signing up the workers as Teamster members.[1] Over the next week, the Teamsters and Growers

---

[1] While conceding that until July 1970 the Teamsters never represented any of the field workers of the 27 Salinas Valley Growers involved in the instant litigation, the Growers emphasize that since 1961 the Teamsters had represented some of the field workers of another Salinas Valley grower, Bud Antle, Inc.

There is some question, however, whether the 1961 Bud Antle-Teamster agreement can accurately be portrayed as demonstrating an historical Teamster interest in representing field workers. One commentator who has researched the facts underlying the 1961 agreement reports that the contract "was not the result of an organizing drive [by the Teamsters]," but instead that "Bud Antle, Inc., perhaps influenced by AWOC [a forerunner of UFWOC] and UPWA [United Packinghouse Workers Association] organizing drives [in the Imperial Valley] and fearing another lettuce strike, approached the Teamsters and signed a contract covering domestic field workers. Company spokesmen expressed a definite preference for contracts with the Teamsters rather than with UPWA, the former being an organization with whom the company could more easily deal." (Glass, *Organization in Salinas* (June 6, 1968) 91 Monthly Labor Rev., at p. 26, cited in Note, *The Unionization of Farm Labor* (1970) 2 U.C. Davis L.Rev. 1, 12, fn. 81.)

proceeded to negotiate detailed contracts covering such specific subjects as wages, hours and other working conditions; although the field workers were the individuals who would primarily be affected by such provisions, these workers were never consulted during the negotiations and were never given an opportunity to examine the terms of the contracts or even to indicate whether they desired to be represented by the Teamsters. Nonetheless, by the end of July each of the 27 Salinas Valley Growers had executed *5-year* exclusive "union shop" agreements with the Teamsters, covering wages, hours and working conditions of the field workers.

Prior to the signing of these contracts, the field workers covered by these agreements had never been represented by any union and, in fact, had not been officially approached by either the Teamsters or the Farm Workers. Affidavits filed by field workers employed by each of the Growers alleged that in the beginning of August some of the Growers and their foremen began to indicate a preference for the Teamsters, encouraging the workers to sign up with that union and warning them that they would lose their jobs if they did not. Many, but not all, of these allegations were denied in counter-affidavits filed by the Growers.

During the first few weeks of August, when the field workers finally were advised of the collective bargaining agreements that had been negotiated on their behalf, most of the workers refused either to join the Teamsters union or to sign or ratify the Grower-Teamster agreements. Although there is some dispute as to the precise number or percentage of field workers favoring either the Teamsters or UFWOC, it appears clear that by mid-August at least a substantial number, and probably a majority, of the applicable field workers desired to be represented by UFWOC rather than by the Teamsters. Thereafter, UFWOC repeatedly demanded that the Salinas Valley Growers recognize it as the freely designated representative of the field workers; when these demands were rebuffed, the field workers, on August 24, 1970, commenced a recognition strike against the Growers on behalf of UFWOC.

The record additionally reveals that during the month of August 1970, Teamster and UFWOC representatives met on several occasions to attempt to alleviate the developing interunion dispute. On August 12, 1970, the two unions executed a jurisdictional agreement which provided generally that (1) UFWOC was not to organize professional truck drivers or workers in canneries and creameries, frozen food processing plants, produce markets, warehouses, dehydrators, or driers, (2) that both unions could organize, inter alia, "workers processing food in the fields," and "workers presently performing operations under contract with Teamsters that move into the field" and (3) that the Teamsters would not recognize or attempt to organize

other agricultural workers. The agreement also contained a clause, however, under which each union agreed not to "raid" any firm presently under an agreement with the other party. On its face, the application of this document to the Salinas Valley situation is ambiguous: although the agreement proscribes all "raiding" of firms holding a contract with either union, it also specifically authorizes UFWOC organizational activity among "workers presently performing operations under contract with Teamsters that move into the field."

The affidavit of Cal Watkins, referred to earlier, provides a limited insight into the intended effect of this agreement with respect to the Salinas Valley workers. Watkins stated that on August 14, 1970—two days after the execution of the jurisdictional agreement—he attended a meeting with Bill Grami, the Teamster bargaining representative, at which the "status" of the jurisdictional pact was discussed. Watkins reported that at the commencement of the meeting Grami stated that it was the Teamsters' position that "any firm [i.e., any of the Growers] . . . which wished to do so could rescind the [field worker] recognition agreement . . . and collective bargaining agreement with the Teamsters." Although the affidavit also states that later on during the meeting, after learning of the closing of a Teamster-represented canning plant by UFWOC picketing, Grami indicated that the Teamsters might want to reconsider this offer of rescission, we may reasonably infer from the remainder of Watkins' affidavit that the Teamsters' offer was not immediately withdrawn. Watkins' document reveals that on August 30, 1970, Inter Harvest, Inc.—which had previously signed an agreement with the Teamsters on July 27, 1970—entered into a collective bargaining agreement with the Farm Workers after an August 23d "card count" of its employees disclosed that a majority desired UFWOC representation.

The 27 Growers involved in the instant proceeding, however, stood by their contracts with the Teamsters. Thereafter, on August 24, 25 and 26, when the field workers commenced their recognition strike on behalf of UFWOC, the Growers filed the present actions in the Monterey County Superior Court seeking an injunction under the California Jurisdictional Strike Act to restrain all concerted activities of UFWOC which interfered with the Growers' farm operations. On the basis of the facts reviewed above, the superior court concluded that each grower had established the existence of a jurisdictional strike within the meaning of Labor Code sections 1115 through 1118, and the court accordingly entered preliminary

injunctions restraining all such concerted activity. Defendants UFWOC and its officers appeal from these preliminary injunctions.[2]

(b) *The Furukawa Farms, Inc.* v. *Chavez action.*

The summer of 1970 brought union organizational activity to the vegetable fields of the Santa Maria Valley, as well as to those of the Salinas Valley. In the Santa Maria Valley, as in the Salinas Valley, the Teamsters had represented numerous farm employees other than field workers for many years; since 1967, the Teamsters had been the exclusive bargaining agent for all of the packing shed workers employed by the 10 Santa Maria Valley growers who instituted the instant action. In addition, on a number of occasions over the three-year period preceding this action, the Teamsters had demanded that these Growers recognize it as the exclusive bargaining agent for all field workers in the Santa Maria Valley. Until July 1970 these demands had been regularly rejected, but on July 24, 1970, the Growers acceded to this demand and recognized the Teamsters as their field workers' exclusive bargaining representative.

The superior court's findings chronicle the events leading up to, and following, the Growers' recognition of the Teamsters as their field workers' representative in late July. UFWOC first formally entered the labor picture in the Santa Maria Valley on July 3, 1970, when it initially demanded that one of the plaintiffs, Point Sal Farming Company, recognize it as the exclusive bargaining agent for the Point Sal field workers; this demand was rejected and UFWOC apparently took no immediate action. On July 15, 1970, the Teamsters entered demands on all but one of the plaintiff Growers, seeking recognition as the exclusive bargaining representative for the *driver-loaders, stitchers, and gluers* employed by these Growers; driver-loaders, stitchers and gluers perform their jobs in the field, but are distinct from the row workers, pickers and packers who constitute the great majority of field workers. In the Santa Maria Valley, for example, out of a total of more than 3,000 field workers employed in lettuce harvesting operations in 1970, there were only approximately 35 driver-loaders, stitchers or gluers.

When the Teamsters' July 15 demands were not immediately met, the union called a strike of the Growers' driver-loaders, stitchers and gluers;

---

[2]In addition to their main contention, discussed below, that no injunction should properly issue under the Jurisdictional Strike Act, defendants assert that the particular injunctions granted by the trial court were so broad as to infringe their constitutionally protected First Amendment rights. Because we have hereafter concluded that the Act's terms do not authorize any injunction under the instant circumstances, we do not reach defendants' constitutional claim.

this strike lasted from July 18 to July 22, and because the strike was honored by the numerous other Teamster members employed by the Growers, this concerted activity succeeded in substantially impairing the lettuce harvesting operations of the struck Growers.

The Growers thereafter entered into negotiations with the Teamsters in an effort to settle the labor dispute. On July 24, 1970, during these negotiations, the Teamsters broadened their July 15 demand and requested recognition as the exclusive bargaining agent for all the field workers employed by the Growers, rather than as simply the representative of the 35 driver-loaders, stitchers and gluers; the Teamsters backed up this new demand with a threat to extend its strike into the fields if its demand was not met. It is undisputed that at the time the Teamsters entered this sweeping demand, the union had not broadly contacted the field workers of any of the Growers and that the field workers had expressed no desire to have the Teamsters represent them. Although the Teamsters enjoyed the support of the small number of driver-loaders, stitchers and gluers, they apparently did not command a similar popularity among the field workers generally.

In spite of the fact that the Teamsters did not claim to represent either a majority, a substantial number, or indeed, any particular number of the Growers' field workers, on July 24, 1970—the very day the Teamsters' broadened demand was set forth—the Growers acceded to this request and orally agreed to recognize the Teamsters as the exclusive bargaining representative of their field workers. The superior court specifically found that the Growers made absolutely no effort to ascertain the wishes of their field workers before agreeing to the Teamsters' terms. Thereafter, on July 27, 1970, the Growers and Teamsters executed a formal written agreement, containing a union shop provision and prescribing hours, wages and other working conditions for the field workers.

On this same day, July 27, 1970, UFWOC entered demands upon most of the Growers in the Santa Maria Valley, urging the Growers to recognize it, and not the Teamsters, as the exclusive bargaining agent for the Growers' field workers. When this demand was rejected, UFWOC struck the Santa Maria Growers' fields, interfering with the Growers' harvesting operations. On August 25, 1970, approximately the same date as the Salinas Valley litigation was commenced, the Santa Maria Growers filed the instant action in the Santa Barbara Superior Court, seeking to enjoin UFWOC's strike activities under the Jurisdictional Strike Act.

After a full hearing which revealed the foregoing facts, the superior court declined to issue a preliminary injunction against UFWOC's peaceful

strike activities. Although the court agreed that the Farm Workers' concerted activities arose out of a controversy between the Teamsters and UFWOC "as to which should have the right to bargain collectively on behalf of" the field workers (see Lab. Code, § 1118), the court concluded that the Growers were not entitled to relief under the Jurisdictional Strike Act because the Growers' premature recognition of the Teamsters constituted an improper "interference with" the Teamsters within the meaning of Labor Code section 1117.[3] The plaintiff Growers appeal from this decision.

### (c) *The common legal question.*

The similarities in these diverse cases are manifest. In each case, the plaintiff Grower insists that he entered into his bargaining agreement with the Teamsters only out of fear of that union's tremendous striking power. And in each case the trial court found that the Teamsters was a wholly independent union, neither financed, dominated nor controlled by any Grower. In addition, however, in all cases it is undisputed that at the time that he recognized the Teamsters as the exclusive bargaining agent of his field workers, each Grower knew that that union did not represent a majority, or even a substantial number, of the field workers for whose benefit the respective collective bargaining agreements were ostensibly being consummated.

Given these facts, the critical legal issue in all of these actions is identical: May an employer who recognizes, as the exclusive bargaining agent of his employees, an independent union which he knows does not represent either a majority or a substantial number of the relevant employees, thereafter obtain an injunction under the California Jurisdictional Strike Act to restrain concerted activities by a competing union? As explained hereafter, the resolution of this question turns on whether the employer's grant of an exclusive bargaining representative status to a nonrepresentative union

---

[3]The trial court additionally found that soon after the signing of the union shop agreements with the Teamsters, supervisory personnel of two of the plaintiff Growers offered Teamster membership cards to three employees and threatened these employees with discharge if they did not join that union; the court concluded that this conduct also constituted employer "interference with" a labor organization under section 1117. The Growers assert that the court's findings on this point were only "supplemental to" and "supportive of" its primary finding of interference based on the Growers' premature recognition of the Teamsters, and they contend that these few, isolated incidents, standing alone, are not sufficient to preclude the issuance of an injunction under the Act. Inasmuch as we have concluded that the trial court's determination on the recognition issue was correct, we have no occasion to decide whether the additional conduct in the instant case was insufficient in itself to amount to improper employer "interference" within the meaning of section 1117.

constitutes an impermissible "interference with" that union within the meaning of section 1117 of the Labor Code. We begin our analysis of this question with a brief description of California's general labor policy which forms the background for the specific Jurisdictional Strike Act provisions at issue in this case.

### 2. *The interpretation of the Act.*

Unlike the federal government and a substantial number of our sister states, California has never adopted a comprehensive, administrative regulatory system for resolving labor disputes. Although such a thorough regulatory system has had many advocates (see, e.g., Hyman & Jaffe, *Jurisdictional Disputes* (1948) N.Y.U. 1st Annual Conference on Lab., pp. 423, 441; Comment, *California Jurisdictional Strike Act* (1953) 6 Stan.L.Rev. 183, 189) and the bitter hardships that regularly accompany the non-regulated status of labor-management relations have been frequently noted (see, e.g., *Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873, 879-880 [4 Cal.Rptr. 179, 351 P.2d 347]), to date our Legislature has rejected all attempts to establish an administrative apparatus comparable to that of the National Labor Relations Board. Instead of comprehensive state regulation, California's policy in the labor field has been one of laissez-faire, a posture which has generally left the resolution of labor disputes to "the free interaction of economic forces." (*Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 469 [2 Cal.Rptr. 470, 349 P.2d 76].)

Thus, the state statutory provisions enacted in this field have generally eschewed establishing the state as the arbiter of labor problems and instead have primarily attempted to ensure a parity between the opponents in labor disputes—explicitly recognizing rights of employees and labor organizations comparable to those of employers, who in earlier days were favored recipients of many legal benefits. As section 923 of the Labor Code, which codifies the state public policy in this field, declares: "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or

coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." In interpreting this provision, our past cases have explained that section 923 was intended "to balance the industrial equation, so far as it is possible to do so, by placing employer and employee on an equal basis." (*Shafer* v. *Registered Pharmacists Union* (1940) 16 Cal.2d 379, 385 [106 P.2d 403]. See generally Margolin, *Duties and Rights of California Unions* (1959) 11 Hastings L.J. 23, 32-33.)

Although California has thus generally followed a non-interventionist governmental policy in the labor field, in a few selected areas the Legislature has moved to proscribe specific tactics of both labor and management, tactics with detrimental consequences which clearly outweigh any possible social benefit. The Jurisdictional Strike Act is one of these limited prohibitory enactments, declaring "jurisdictional strikes" as defined in the Act[4] to be against the public policy of the state (§ 1115), and providing a state injunctive remedy against certain concerted activities utilized in such a situation. (§ 1116; cf. *United Farm Workers Organizing Committee* v. *Superior Court* (1971) 4 Cal.3d 556 [94 Cal.Rptr. 263, 483 P.2d 1215].)

As we noted in *Smyrniotis* v. *Local Joint Executive Bd.* (1966) 64 Cal. 2d 30, 35 [48 Cal.Rptr. 725, 409 P.2d 949], one of our most recent decisions interpreting the Act, "[t]he legislative motivation for adoption of the Act obviously lay in the inequity visited upon an employer helplessly caught in the throes of an internecine union struggle for which he was not responsible as well as in the social cost which such a dispute entailed." (See also *Seven-Up etc. Co.* v. *Grocery etc. Union* (1953) 40 Cal.2d 368, 376 [254 P.2d 544, 33 A.L.R.2d 327].) Thus, the Act provides a remedy for the innocent employer besieged by the conflicting and irreconcilable demands of two competing unions, either one of which may have the potential for destroying his business.

In establishing this remedy against destructive union competition, however, the Legislature was keenly aware of the danger that employers might

---

[4]Section 1118 of the Labor Code provides in full: "As used in this chapter. 'jurisdictional strike' means a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer."

Hereafter all section references are to the Labor Code, unless otherwise stated.

attempt to transform this shield against interunion rivalry into a weapon which might be utilized selectively to stifle legitimate union activity and to further the employer's own interests in labor affairs. In order to prevent such a conversion of the Act into simply a new weapon in the employer's arsenal, the Legislature carefully circumscribed the Act's application by including a number of provisions limiting the situations in which the state's power could be resorted to by the employer.

The *Smyrniotis* decision, referred to above, analyzed one of the limiting features of the Act, the clause in section 1118 which confines jurisdictional strikes to interferences with an employer's business which actually *"aris[e] out of a* controversy between two labor unions" as to which should be the exclusive bargaining agent of the employer's workers or which should be assigned certain work. Although prior decisions of this court had in effect read this limiting language out of the Act by indicating that an injunction was available to an employer whenever two unions posed conflicting demands regardless of the origin of either union's dispute (see *Voeltz* v. *Bakery etc. Union* (1953) 40 Cal.2d 382 [254 P.2d 553]; *In re Kelleher* (1953) 40 Cal.2d 424 [254 P.2d 572]), the *Smyrniotis* court reanalyzed these decisions and determined that their broad rendition of the Act was contrary to the clear legislative intent expressed by the limiting statutory language. *Smyrniotis* recognized that by restricting the Act's application to situations in which a union's concerted activities against an employer *originate* from an interunion conflict, the Legislature had deliberately precluded an employer from obtaining an injunction against legitimate strike activity which had emanated from a preexisting dispute between the employer and one union, simply because another union subsequently entered the picture.[5] After pointing out that a contrary interpretation of the Act would in some cases have the unintended effect of "allow[ing] the employer . . . to contract with the union that offers him the best terms and to enjoin interference from other unions" (64 Cal.2d at p. 39, quoting *Voeltz* v. *Bakery etc. Union* (1953) 40 Cal.2d 382, 390 [254 P.2d 553] (Carter, J., dissenting)), the court emphasized that such an interpretation was impermissible for the Legislature had not "intended the Act to serve as a weapon in an employer's arsenal for use at a propitious moment for strike breaking purposes." (64 Cal.2d at p. 42.)

---

[5]Thus, in *Smyrniotis* itself, the court held that an injunction would not properly issue against a union's strike activity which had commenced over a disagreement with the employer as to working conditions prior to the time the second union appeared on the scene. Although the second union's entry and demand for recognition as the exclusive bargaining agent of the employees may then have confronted the employer with conflicting demands, the first union's concerted activities against the employer did not "arise out of" a controversy between two labor organizations and thus the Jurisdictional Strike Act was not applicable.

In the instant case, of course, UFWOC did not have a preexisting labor dispute with the Growers generally, and the Farm Workers do not contest the conclusion of both trial courts that its concerted activities against the Growers did arise out of the conflicting claims between the Teamsters and UFWOC. Thus, as the Growers suggest, the limitation of the Jurisdictional Strike Act at issue in *Smyrniotis* is not directly involved in the present litigation.

■ Instead, the cases at bar involve the proper interpretation of a second and distinct statutory limitation on the reach of the Jurisdictional Strike Act, a limitation embodied in section 1117's provisions which preclude the application of the Act whenever the employer fails to establish that neither of the competing labor organizations has been "financed in whole or in part, interfered with, dominated or controlled" by him within a year of the commencement of the action.[6] This limiting provision, like the one addressed in *Smyrniotis,* is intended to prevent the employer from resorting to the Act to thwart legitimate union activities rather than to alleviate himself from the conflicting demands of two rival unions.

Historically, employers frequently attempted to forestall truly independent union organizational activity by encouraging the formation of "inside," "company unions" over which the employers could maintain significant control, and which would be much less demanding than strong independent unions. It is at such traditional employer-dominated unions that the limiting clause of section 1117 is most directly aimed, for the Legislature realized that through the use of such organizations to create "interunion" disputes with outside unions, the employer could improperly bring to bear the state's injunctive power to avoid a feared, but legitimate, union organizational effort.

To prevent such use of the Act, section 1117 provides that any organization which is "financed in whole or in part, . . . dominated or con-

---

[6]As quoted in footnote 4 *supra,* section 1118 defines a "jurisdictional strike" in part as "a concerted refusal to perform work for an employer . . . arising out of a controversy between two or more *labor organizations* . . . ." (Italics added.) Section 1117, in turn, defines "labor organization" as "any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, *which labor organization is not found to be or to have been financed in whole or in part, interfered with, dominated or controlled by the employer or any employer association within one year of the commencement of any proceeding brought under this chapter.*" (Italics added.) The section also provides that in any suit under the Act "[t]he plaintiff shall have the affirmative of the issue with respect to establishing the existence of a 'labor organization' as defined herein."

trolled" by an employer is not a "labor organization" within the meaning of section 1118, and thus that another union's conflict with such an organization does not constitute a "jurisdictional dispute." In the instant case, however, both trial courts found that the Growers had borne their burden of proving that they had not "financed . . . dominated or controlled" the Teamsters, and, not surprisingly, UFWOC concedes that the large and powerful Teamster union cannot be considered a "company union" of any of the Growers in the traditional sense. The Growers contend that in light of this absence of any *domination* or control over the Teamsters, section 1117 does not bar their entitlement to injunctive relief.

In drafting section 1117, however, the Legislature additionally recognized that even when an employer does not undertake such blatant action as actually "controlling" or "dominating" a labor organization, there remains a substantial danger that the employer will use more subtle means either to encourage or to favor one of two competing unions, and will then attempt to resort to the Jurisdictional Strike Act to eliminate the less desired labor organization.[7] Appreciating that such favoritism towards one union could ultimately defeat the interests of the relevant employees and could again bring the state injunctive power into play as an employer's affirmative weapon against a particularly feared union, the Legislature, in section 1117, proscribed—in addition to financing, domination or control—any employer *"interference with"* competing unions. ■ As the legislative history of the section—set out in the margin[8]—clearly demon-

[7]In his article on the Jurisdictional Strike Act, Professor Aaron points out that "an employer faced by an unwelcome organizational drive by a particular union may give varying degrees of encouragement to another union to enter the situation and create a jurisdictional dispute." He concludes that in such a case "the employer's conduct would seem to disqualify him from making the usual claim that he has been unwillingly involved in a fight that is not of his own making; . . ." (Aaron, *The California Jurisdictional Strike Act* (1954) 27 So.Cal.L.Rev. 237, 237-238.)

[8]The evolution of section 1117, from its initial introduction in the state Senate in February 1947, to its final enactment into law in June of that year, demonstrates quite clearly that the Legislature consciously intended the reference to employer "interference with" a labor organization to encompass activities distinct from employer "domination" or "control."

The original draft of section 1117, introduced by Senator Rich on February 5, 1947, defined "labor organization" simply as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work." This initial version contained no exclusionary clause for labor organizations "dominated" or "interfered with" by an employer, apparently because the problem of such misuse of the Act had not yet been anticipated.

By the time the bill was first amended on April 18, 1947, however, the possibility of employer abuse of the Act had been identified, and on that date the original definition of "labor organization" was amended by the addition of the clause "which

strates, in withholding injunctive relief from any employer who had "interfered with" a labor organization, the Legislature intended to encompass employer conduct which did not reach the level of "domination" or "control" of a labor organization; given this legislative history, we must reject the Growers' attempt simply to equate the section's "interference" language with its "domination" or "control" concepts. (Cf. *Humble Oil & Refining Co. v. National Labor R. Board* (5th Cir. 1940) 113 F.2d 85, 88.)

The relevant legal question in the instant case thus becomes whether the employer Growers' recognition of the Teamster union at a time when the Teamsters did not represent any substantial number of the relevant field workers amounts to employer "interference with" the Teamsters within the meaning of section 1117. Although section 1117 does not expressly define what employer conduct constitutes improper "interference with" a union under its terms, we are not without guidance as to the legislative intent in this regard. In drafting section 1117, the Legislature adapted the prohibition on employer "domination," "financing" *and* "interference" from parallel terminology of section 8(a)(2) of the federal Labor Management Relations Act (29 U.S.C. § 158(a)(2))[9] which provides that "[i]t shall be an unfair labor practice for an employer . . . to dominate *or interfere* with the formation or administration of any labor organization or contribute financial or other support to it. . . ." (Italics added.) ▮ In light of the

---

is not found to be *employer controlled or dominated."* (Italics added.) This version of section 1117 survived several amending sessions—on April 25, May 15 and May 20—in which other sections of the Act were altered. On June 9, 1947, the initial clause of section 1117 was substantially revised to redefine "labor organization" as "a bona fide employees' organization, or any local unit thereof, which exists for the purpose, in whole or in part, of dealing with employers concerning wages, hours of employment, or conditions of work . . ."; this version too, however, retained the simple proviso "which organization is found not to be employer controlled or dominated."

Finally, however, on June 19, 1947, the Legislature again redrafted section 1117, reinstituting the earlier general definition of labor organization, and, most significantly for the instant case, expanding the concluding portion of the section to exclude not only organizations which are "employer controlled or dominated" but also organizations which are "financed in whole or in part, *interfered with,* dominated or controlled by the employer . . . ." (Italics added.) This version of the section was ultimately signed into law on June 23, 1947, and remains essentially unchanged today.

This legislative history demonstrates beyond question that the inclusion of the "interference" terminology in section 1117 was not accidental. Beginning with the first broad definition of "labor organization" which did not exclude any "company unions" at all, the Legislature progressively narrowed the section's definition of "labor organization," ultimately excluding those organizations which—while not "dominated" or "controlled" by an employer—are "interfered with" by his actions.

[9]This section was originally enacted in 1935, as section 8(a)(2) of the National Labor Relations Act (the Wagner Act). In 1947, it was reenacted as section 8(a)(2) of the Labor Management Relations Act (Taft-Hartley Act).

similar language and purposes of the state and federal provisions, this court has long recognized that "[f]ederal decisions construing section 8(a) . . . (2) . . . are persuasive in interpreting section 1117 . . . ." (*Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 459 [2 Cal.Rptr. 470, 349 P.2d 76]; see *Sommer* v. *Metal Trades Council* (1953) 40 Cal.2d 392, 400 [254 P.2d 559].)

In *Petri,* the most recent and the leading decision of this court interpreting section 1117's reference to employer "interference" with a labor organization, Justice Traynor undertook an extensive review of the federal authorities and highlighted some of the "typical activities condemned by the federal act." (53 Cal.2d at p. 460.) He noted: "Activities that constitute interference include *manifestations by the employer that he favors one union over the other (International Assn. of M. T. D. M. L.* v. *National Labor Relations Board* [(1940)] 311 U.S. 72, 78 . . . [Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure.]; *National Labor Relations Board* v. *Link-Belt Co.* [(1941)] 311 U.S. 584, 600 . . . [Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge.]); interrogation of employees as to their union sympathies, especially when coupled with threats of discharge for supporting the outside union or promises of economic benefits for remaining loyal to the company [citations]; . . . unequal advantages conferred upon the inside union that are denied the outside union, such as use of company time and property [citations]; and *hasty recognition of the inside union,* as contrasted with marked reluctance to recognize the outside union [citation]." (Italics added.) (53 Cal.2d at pp. 460-461.) Quoting with approval an earlier Fourth Circuit opinion in *American Enka Corp.* v. *National Labor Relations B.* (4th Cir. 1941) 119 F.2d 60, 62, the *Petri* court further observed that " '[s]eldom does the domination and interference with employee representation which the Act prohibits take the form of threats or coercion. *More often it is to be found in the guise of friendly cooperation;* . . .' " (Italics added.) (*Id.*)

■ As this discussion from *Petri* indicates, a prime indicant of improper employer "interference"—for purposes of both the federal act and our parallel state provision—is conduct by which an employer illustrates his favoritism for one union over another. In the context of our state act, such favoritism raises the suspicion that the employer is resorting to the Jurisdictional Strike Act to eliminate the less favored of two competing unions rather than simply to rescue himself from a helpless position.[10]

---

[10]Cf. *National Labor Relations Board* v. *Griswold Mfg. Co.* (3d Cir. 1939) 106 F.2d 713, 722 ("[t]he language of section 8 of the National Labor Relations Act

In all of the instant cases, of course, the Growers contend that their recognition of the Teamsters did not result out of any favoritism for that union as opposed to UFWOC, but simply out of fear of the Teamsters' significant economic power. The application of section 1117, under the circumstances of the instant case, however, does not require an inquiry into the subjective motives of the individual growers, but can instead be determined on the basis of the employers' objective actions.

As the relevant federal cases in this area have recognized, whatever the motivation for the employer's conduct (see *National Labor Relations Board* v. *Gluek Brewing Co.* (8th Cir. 1944) 144 F.2d 847, 853), from a practical point of view an employer's grant of exclusive bargaining status to a non-representative union must be considered the ultimate form of favoritism, completely substituting the employer's choice of unions for his employees' desires. Thus, in *Garment Workers* v. *Labor Board* (1961) 366 U.S. 731, 738 [6 L.Ed.2d 762, 768, 81 S.Ct. 1603], the United States Supreme Court declared unambiguously that "[t]he law has long been settled that a grant of exclusive recognition to a minority union constitutes unlawful support [of a labor organization] in violation of . . . section [8(a)(2)]." Other federal cases have uniformly agreed that "an employer violates section 8(a)(2) of the Act when he recognizes one of two competing unions as exclusive bargaining agent if, at the time of recognition, the employer had actual or constructive knowledge that a real question concerning the representation of his employees existed." (*Iowa Beef Packers, Inc.* v. *NLRB* (8th Cir. 1964) 331 F.2d 176, 182; see, e.g., *Tennessee Products & Chemical Corporation* v. *NLRB* (6th Cir. 1970) 423 F.2d 169, 179-180, cert. den. 400 U.S. 822 [27 L.Ed.2d 50, 91 S.Ct. 42]; *NLRB* v. *Trosch* (4th Cir. 1963) 321 F.2d 692, 696, cert. den. (1964) 375 U.S. 993 [11 L.Ed.2d 478, 84 S.Ct. 632]; *NLRB* v. *Signal Oil and Gas Company* (5th Cir. 1962) 303 F.2d 785, 786-787; *St. Louis Independent Packing Company* v. *NLRB* (7th Cir. 1961) 291 F.2d 700, 704; *Midwest Piping & Supply Co.* (1945) 63 N.L.R.B. 1060.)

■ As *Petri* declared, given the similarity of the language and rationale of the state and federal acts, these federal decisions are "persuasive" in interpreting section 1117, and in light of the uniformity of this strong federal precedent, we conclude that an employer "interferes with" a union within the meaning of section 1117 whenever he fails to remain neutral and grants exclusive bargaining status to a union—albeit an "independent," nondominated union—which he knows is not representative of his em-

prohibiting domination or interference . . . must be broadly interpreted so as to cover any conduct on the part of an employer which is intended to bring into being an organization which [the employer] has reason to believe will be 'friendly.' ").

ployees. Without such an interpretation of the Act — suggested by the federal authorities—an employer who anticipates an organizational drive by a feared union desired by his employees would be free simply to grant exclusive bargaining status to *any* independent union and then subsequently to utilize the Jurisdictional Strike Act to forestall concerted activity by the more representative union. ██ As in *Smyrniotis,* such an interpretation would subvert the true purpose and scope of the Act, converting the enactment from a fundamentally defensive shield against interunion warfare into a powerful sword with which an employer could selectively eliminate its strongest adversary.[11]

---

[11]The Salinas Valley Growers additionally claim that their recognition of the Teamsters could not reflect any favoritism for that union over the Farm Workers, because on the date of recognition the Farm Workers had not even appeared "on the scene." Asserting that it was not until one or two weeks after the recognition agreements were signed that UFWOC first formally contacted the field workers, the Growers argue that there can be no "interference" under section 1117 unless, at the time the employer acts, there are two labor organizations actually present "on the scene" and actively competing for recognition.

In the first place, however, the federal decisions do not support such a limited interpretation of "interference." For example, in the *Garment Workers* case itself, although the minority union recognized by the employer—a strong, independent, noncompany union comparable to the Teamsters—was the only union involved (366 U.S. at p. 733 [6 L.Ed.2d at p. 765]), the court still found the employer's recognition of such a union to constitute improper "interference." (366 U.S. at p. 738 [6 L.Ed.2d at pp. 767-768].) (Cf. *NLRB* v. *Trosch* (4th Cir. 1963) 321 F.2d 692, 695, cert. den. (1964) 375 U.S. 993 [11 L.Ed.2d 478, 84 S.Ct. 632].)

Moreover, the Growers' proposed limitation of section 1117 would leave an employer free to utilize the act to stifle legitimate union organizational activity whenever the employer, *anticipating* an imminent organizational drive, beats the union "to the punch" by hastily recognizing a less-feared labor organization. Indeed, the facts related above suggest that in the instant case the Salinas Valley Growers' anticipation of a Farm Workers drive may well have contributed to the employers' precipitous capitulation to the Teamsters' demand for recognition in late July. Although the affidavits before us do not affirmatively show that UFWOC had formally approached the Salinas Valley field workers before August 1970, they do reveal (1) that UFWOC had demanded recognition by at least one lettuce grower in the Santa Maria Valley on July 3, 1970, and (2) that when the Salinas Valley field workers were finally given an opportunity to indicate their choice of bargaining representative early in August, a substantial number demonstrated their support of the Farm Workers. Furthermore, the immediacy of the Farm Workers' reaction to the Salinas Valley Growers' recognition of the Teamsters—coming within a week of that recognition—strongly suggests that UFWOC's interest in representing such field workers predated the execution of the Teamster-Grower agreements. Under these circumstances, it seems clear that the Farm Workers must realistically be considered as having been "in the labor picture," if not "on the scene," at the time the Growers signed the recognition agreements with the Teamsters.

Because an employer's recognition of a nonrepresentative union in anticipation of an organizational drive can frustrate his employees' desires and can further the employer's personal objectives as effectively as activity undertaken after a rival union has appeared "on the scene," we reject the Growers' proposed limitation of section 1117.

At oral argument the Growers also contended that unless the Act were confined

The Growers contend, however, that notwithstanding the declarations of our prior cases, the federal authorities cited above cannot be relied on in our state labor context. The Growers point out that unlike the federal legislation, California statutes do not establish any certification procedure for designating which union *is* the choice of a majority of the employees, and they argue that under these circumstances the federal cases which contemplate such a certification mechanism are not apposite. We recognize, of course, that the absence of a state certification procedure does prevent a complete parallel to the federal system, and that the propriety of an employer's recognition of a union cannot depend upon the union's obtaining a "certified" status. We do not agree, however, that the lack of a state certification device renders all reliance on the federal decisions improper, for the *Petri* decision—as well as the other authorities affirming the applicability of federal precedent in this context—clearly recognized that the state and federal labor systems were far from identical.

Although an employer cannot be penalized for recognizing a union simply because that organization has not been "certified," it does not follow that section 1117's proscription on "interference" leaves an employer free to recognize any union whatsoever, regardless of its clear lack of support among the employees. ■ In modeling the relevant clause of section 1117 after the federal act, the Legislature obviously intended the section's interpretation to be guided, as fully as practicable, by federal law; by analogy to the applicable federal cases (cf., e.g., *NLRB* v. *Air Master Corporation* (3d Cir. 1964) 339 F.2d 553, 557), we hold that in order to avoid the consequences of improper "interference" with a labor organization, an employer must at least possess a reasonable, good faith belief that the union he recognizes as the exclusive bargaining agent of his employees is desired by a majority of the relevant employees.[12]

to situations in which an employer acted improperly when two unions were actually "on the scene," a second union could appear five or ten years after the employer had recognized one union and could avoid the Jurisdictional Strike Act by challenging the propriety of the remote and unrelated recognition agreement. The terms of section 1117, however, specifically preclude a later-appearing union from claiming a perpetual "immunity" under the Act, for the section bars relief only where one of the labor organizations is found to have been "financed, . . . interfered with, dominated or controlled by the employer . . . *within one year of the commencement of any proceeding brought under this chapter.* . . ." (Italics added.)

[12]Although we recognize that in *Garment Workers* v. *Labor Board* (1961) 366 U.S. 731, 738-739 [6 L.Ed.2d 762, 767-768, 81 S.Ct. 1603], the United States Supreme Court concluded that under the federal act a good faith belief in the majority status of a union was not sufficient to preclude a finding of "interference" if such union in fact only enjoyed minority support, the differences between state and federal law noted above renders this strict interpretation impracticable in the state context. Under the federal scheme, the *Garment Workers* rule is feasible because there exists a statutory certification procedure for definitely determining which union

Although we are aware that the present decision is the first explicitly to articulate this requirement (cf. *Sommer* v. *Metal Trades Council* (1953) 40 Cal.2d 392, 400 [254 P.2d 559]), a review of the prior California decisions which have granted relief under the Jurisdictional Strike Act discloses that our conclusion is entirely consistent with the facts underlying each of these controversies. For example, in all of the early cases under the act in which an employer successfully obtained an injunction against concerted activities by an "outside" union, the "inside" employees' association clearly enjoyed the support of a majority of the relevant employees. (See *Seven-Up etc. Co.* v. *Grocery etc. Union* (1953) 40 Cal.2d 368 [254 P.2d 544, 33 A.L.R.2d 327]; *Sommer* v. *Metal Trades Council* (1953) 40 Cal.2d 392 [254 P.2d 559]; *Voeltz* v. *Bakery etc. Union* (1953) 40 Cal.2d 382 [254 P.2d 553], overruled on other grounds in *Smyrniotis* v. *Local Joint Executive Bd.* (1966) 64 Cal.2d 30, 40 [48 Cal.Rptr. 725, 409 P.2d 949].)[13]

Similarly, in *In re Kelleher* (1953) 40 Cal.2d 424 [254 P.2d 572], overruled on other grounds in *Smyrniotis* v. *Local Joint Executive Bd.* (1966) 64 Cal.2d 30, 40 [48 Cal.Rptr. 725, 409 P.2d 949], the court carefully related the extensive factual background of a labor dispute between two independent unions, and pointed out that before recognizing one of the competing unions as the exclusive bargaining agent of the workers, the employer, Isthmian Shipping Lines, insisted that that union produce proof of its majority status. Thereafter, the union presented the employer with

is desired by a majority of workers; indeed the *Garment Workers* court itself defended its holding on the ground that it "places no particular hardship on the employer . . . [for] [i]t merely requires that recognition be withheld until the Board-conducted election results in majority selection of a representative." (366 U.S. at p. 739 [6 L.Ed.2d at p. 768].) Since there is no comparable, definitive administrative apparatus established by state law, we believe the underlying policy of the provision can best be served by requiring that an employer have a reasonable, good faith belief in the majority status of the union which he recognizes in order to avoid "interfer[ing] with" the union within the meaning of section 1117.

[13]In *Seven-Up etc. Co.* v. *Grocery etc. Union* (1953) 40 Cal.2d 368, 371 [254 P.2d 544, 33 A.L.R.2d 327], the first case arising under the Act, the allegations of plaintiff's complaint—admitted as true by defendants' demurrer—declared that the employee association recognized by the employer, was supported by *all* of the employees. In *Sommer* v. *Metal Trades Council* (1953) 40 Cal.2d 392, 394 [254 P.2d 559], the employer sought an injunction against an outside union which had received the support of only 5 out of 30 employees in a representation election held at the plant; the remaining 25 employees voted in favor of an employees' local. And in *Voeltz* v. *Bakery etc. Union* (1953) 40 Cal.2d 382, 384 [254 P.2d 553], overruled on other grounds in *Smyrniotis* v. *Local Joint Executive Bd.* (1966) 64 Cal.2d 30 [48 Cal.Rptr. 725, 409 P.2d 949], the employer recognized an employee association which represented 37 out of 39 workers and sought an injunction against an outside union which, at its high point of popularity, represented only 10 of the employer's workmen.

pledge cards signed by 128 of the employer's 204 workers and only then did the employer enter into an exclusive bargaining agreement with the union. (40 Cal.2d at pp. 428-429.) Finally, the numerous Court of Appeal decisions under the Jurisdictional Strike Act have also generally arisen from situations where the union "favored" with recognition by the employer has in fact represented a substantial majority of the relevant workers. (See, e.g., *Culinary Alliance etc. Union* v. *Beasley* (1955) 135 Cal.App.2d 186 [286 P.2d 844]; *Howard Pack. Co.* v. *Meat etc. Butchers* (1955) 137 Cal.App.2d 393, 396 [290 P.2d 343]; *Corrigan* v. *Barbers & Beauticians Union* (1967) 251 Cal.App.2d 490 [59 Cal.Rptr. 533].)[14]

■ To our knowledge, the present case is the first instance in which employers have granted exclusive bargaining status to a union which the employers know does not represent a majority or even a substantial number of their employees, and have thereafter sought to utilize the state's injunctive power to curtail concerted activities by a union which claims to be more representative of the employees. (Cf. *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 466-469 [2 Cal. Rptr. 470, 349 P.2d 76].) As discussed above, we conclude that under these circumstances the language of the Act bars the employer from such relief.

The Growers further contend, however, that this interpretation of section 1117 conflicts (1) with the long line of California cases which have affirmed the legality of concerted union activity to obtain a union or closed shop agreement even when the union represents none of the employees in the plant (see, e.g., *Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873 [4 Cal.Rptr. 179, 351 P.2d 347]; *Shafer* v. *Registered Pharmacists Union* (1940) 16 Cal.2d 379 [106 P.2d 403]; *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940) 16 Cal.2d 311 [106 P.2d 373]) and, (2) even more directly, with a statement in the latter portion of the *Petri* opinion declaring that "employers are not required by law to engage in collective bargaining and that closed or union shop agreements and concerted activities to achieve them are lawful in this state *whether or not a*

---

[14]In *Culinary Alliance etc. Union* v. *Beasley* (1955) 135 Cal.App.2d 186, 188 [286 P.2d 844], the employee association represented six of the employer's eight employees at the time it was recognized as the exclusive bargaining agent. In *Howard Pack. Co.* v. *Meat etc. Butchers* (1955) 137 Cal.App.2d 393 [290 P.2d 343], the recognized association had been certified as the legitimate bargaining agent of the employees by the National Labor Relations Board, and therefore clearly represented a majority of the relevant workers. In *Corrigan* v. *Barbers & Beauticians Union* (1967) 251 Cal.App.2d 490, 500 [59 Cal.Rptr. 533], the defendant union conceded that it represented none of the relevant employees and that such workers instead all belonged to another independent union which had been recognized as the exclusive bargaining agent by the plaintiff employer.

*majority of the employees directly involved wish such agreements.*" (Italics added.) (53 Cal.2d at pp. 474-475.) The Growers argue that since under these authorities neither the Teamsters' demand for a union shop contract nor the employer's signing of such an agreement with that nonrepresentative union was "illegal," such activity cannot properly be deemed "interference" within the meaning of section 1117.

This conclusion, however, simply does not follow from the precedent relied on by the Growers. The line of cases affirming the right of a union to undertake concerted activities even when it has no current membership in a plant represents simply one application of the state's "laissez faire" labor policy, generally permitting both labor and management to utilize their economic power free from government restraint. (See *Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873, 879-880 [4 Cal.Rptr. 179, 351 P.2d 347].) Similarly, the dictum from *Petri* relied on so heavily by the Growers appeared in a portion of that decision which held only that even when a union can prove it has the majority support of the workers, the union is not entitled to enlist the state's injunctive power *to require* the employer to bargain with it. *Petri* declared that, under current law, the state could not impose the settlement requested by the union, for "[a]n employer's decision whether or not to bargain with a labor organization has long been determined in this state by the free interaction of economic forces." (53 Cal.2d at p. 469.)

Although we reaffirm the validity of these decisions' conclusions that closed or union shop agreements between a nonrepresentative union and an employer are not "illegal" in the sense that such agreements are not prohibited by state law and will not be enjoined by the state, these authorities in no way mandate or, indeed, even intimate, that an employer or union which enters into such an agreement shall thereafter be free to secure the state's intervention on its behalf under the Jurisdictional Strike Act. As related above the Jurisdictional Strike Act constitutes but a limited exception to California's general "laissez faire" labor policy and a party can invoke the state's injunctive sanction under the Act only if the labor dispute falls within the limited category of disputes defined above. The *Messner* and *Petri* cases, though indicating that the state will not directly intervene to curtail or restrain certain union organizational activity or the employer's response to it, do not commit the state to act affirmatively to protect a bargaining relationship consummated between an employer and an unrepresentative union.

Indeed, the *Petri* case itself demonstrates the fallacy of the Growers' argument. In that case, although the court affirmed the "legality" of the employer's contract with an unrepresentative union and refused to compel

him to bargain with the majority association, it at the same time rejected the employer's attempt to secure an injunction under the Jurisdictional Strike Act, concluding that the employer's activities with the "inside" union, though "legal," still constituted "domination" and "interference" within the meaning of section 1117. Thus, contrary to the Growers' contention, our conclusion today represents no departure from the teachings of *Messner* or *Petri* and works no fundamental change in California's labor law.

To reiterate, in order to preserve his right to utilize the Jurisdictional Strike Act an employer need only make a good faith effort to assure that any independent union he recognizes as the exclusive bargaining agent of his employees is actually desired by those employees. Furthermore, when more than one union is competing for such exclusive representative status, an employer can preserve his rights under the Act simply by maintaining a strict neutrality among all competing labor organizations. Although we recognize that an employer confronted with a demand from a powerful, but nonrepresentative, union for a closed or union shop contract is in a difficult position, it should be understood that the hardship faced by such an employer is not engendered by our present interpretation of the Jurisdictional Strike Act, but results instead from the maintenance of an essentially unregulated state of labor relations in California. Under such a system, in which no procedure is established to ensure a democratic and peaceful selection of the bargaining representatives desired by the employees, employers cannot properly invoke the state's power to secure their own choice of a bargaining agent for their employees. Relief from the "bitter" hardships that all parties to labor disputes face under current law (see *Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873, 880 [4 Cal.Rptr. 179, 351 P.2d 347]) must await a comprehensive overhaul of the state's labor statutes.

In sum, we conclude that an employer who grants exclusive bargaining status to a union which he knows does not have the support of his employees may not thereafter call upon the state to enjoin concerted activities by a competing union. Although this state has yet to adopt a comprehensive statutory procedure under which an employer could be required to bargain collectively with the democratically selected representative of his employees, California's Jurisdictional Strike Act was never intended to place the power of the state behind the employer's unilateral grant of exclusive bargaining status to a clearly nonrepresentative union. As we have explained above, in light of both the uniform federal precedent and the purposes underlying our state act, we hold that unless an employer reasonably believes in good faith that a union enjoys the support of a majority of his employees, his

recognition of that union as the exclusive bargaining agent for such employees constitutes an "interference with" that union within the meaning of section 1117, and bars him from obtaining an injunction against a rival union under the Jurisdictional Strike Act.

Accordingly, the judgments in the *Englund* v. *Chavez* cases, granting preliminary injunctions, are reversed, and the judgment in *Furukawa Farms, Inc.* v. *Chavez*, denying injunctive relief, is affirmed.

**McCOMB, J.**—I dissent. In the *Englund* v. *Chavez* cases, I agree with the decision of the Court of Appeal and would affirm the trial court's granting the injunctions, as modified by the Court of Appeal, First Appellate District, Division Two, in the opinion prepared by Mr. Presiding Justice Taylor (101 Cal.Rptr. 54). I would reverse the judgment in *Furukawa Farms, Inc.* v. *Chavez*, for the reasons stated by Mr. Justice Compton in the opinion prepared by him for the Court of Appeal, Second Appellate District, Division Two (102 Cal.Rptr. 271).